## POMEROY *vs.* SELMES.

A bill of exceptions cannot be tendered and signed at a subsequent term of the court without the consent of the other party.

### ERROR to St. Louis Court of Common Pleas.

MIRAN LESLIE, *for Plaintiff in Error.*

1. The assignment was void, as against the letter and policy of the late Bankrupt Act.

2. The assignment, if otherwise good, was void as assigning the property of Selmes to pay the debts of McFarlane.

GEYER, *for Defendant in Error.*

1. No question arises on the bill of exceptions, the exceptions not having been taken during the trial, nor at any time before verdict; at least, it is doubtful when the exceptions were taken, and in such case the court will intend against the party whose duty it was to make the matter plain.—Rev. Code, 1835, p. 464, sec. 20; 3 Cowan, 32; 9 Johns., 346; 1 Salk, 288; 4 Peters, 107; 7 Mo. Rep., 210, 250; 2 *Ibid.*, 195.

2. None of the reasons assigned for a new trial can be considered by this Court: the bill of exceptions does not purport to set out the whole evidence. (Hammond *vs.* Russel et al., 1 Mo. Rep., 232; 4 *Ibid.*, 18, 438; 5 *Ibid.*, 110; 7 *Ibid.*, 6.) The Court cannot ascertain whether the verdict is without or against evidence, nor whether the instructions asked or given were proper. It may be, and most probably it was proved, that Pomeroy, the plaintiff, was party to the fraud of Selmes; that all the property attached was *bona fide* the property of McFarlane, and was sold to him by the very persons for whose benefit the assignment was made.

3. For anything that appears upon the record, the decision of the court below, in refusing instructions prayed for, and in giving those which were given, were entirely correct; because—

1st, It does not appear that any of the goods transferred by Selmes to McFarlane were among those assigned by the latter, or attached by the plaintiff; on the contrary, all the goods attached appear to have been purchased by McFarlane, on his own credit.

2d, The goods purchased by McFarlane in his own name, and with his own money, never were the goods of Selmes, and could not be held to the payment of his debts, to the exclusion of the creditors of McFarlane.

3d, If the goods, whether transferred by Selmes, or purchased by McFarlane,

could be regarded as the property of Selmes, as between his creditors and McFarlane, they were still more clearly the property of McFarlane, as between his creditors and Selmes.

4th, The assignment under which Dickson claims being for the benefit of creditors, the legal effect is the same as if an absolute sale had been made by McFarlane to the creditors, in whole or in part satisfaction of their demands. The trustee is not a mere volunteer, and is entitled to all the immunities of a *bona fide* purchaser for valuable consideration. He holds the property against the creditors of the fraudulent grantor.—3 B. A., 307, 8, 9; 13 J. Rep., 471; 18 *Ibid.*, 575; 6 Cranch, 133; 2 Sug. on Vend., 198; Newel *vs.* Kean, 1 Mo. Rep., 754; 5 *Ibid.*, 296.

5th, If Selmes is to be regarded as the owner of the goods purchased by McFarlane of others, it must be because they were purchased with the money of Selmes, an assumption inconsistent with the record.

6th, Regarding Selmes as the real owner of the goods, McFarlane was the apparent owner, and Selmes was trading in the name, and doing all things by the hand of McFarlane, in making the assignment, as well as in all else. If the goods purchased in the name of McFarlane were his, so also were the debts contracted in the purchase.

7th, The power of McFarlane to make the assignment in his own name, was as complete and full as his power to sell in the course of business; and the creditors of Selmes can no more impeach the assignment, than they could a sale made in the course of business.

8th, It is perfectly consistent with the facts stated on the record, that the assignment was made with the consent, and by the authority of Selmes, or was ratified by him afterwards; and in either event, the assignment must be regarded as the act of Selmes.

9th, The assignment being the act of Selmes, is not fraudulent, because one set of creditors are preferred to the exclusion of others; such deeds are valid, not only as between the parties, but as against the excluded creditors.

10th, The first instruction refused refers to the goods assigned, not those attached, and to an indefinite time. If the time of the attachment is meant, it is clearly wrong, in that it refers a question of law to the jury; if the time of the assignment, it is wrong, because of the same objection, and moreover excludes from the jury the acts of the parties between the execution of the deed and the levy, and excludes also the fact, that the plaintiff was one of those who held out to the world that McFarlane was the owner, had sold him goods, (a part, perhaps, of those attached as such) and calls upon the jury to prefer the plaintiff to the creditors which he had conspired to delude.

11th, The second instruction refused assumes, as a proposition of law, that if Dickson only claimed the property as assignee of McFarlane, for the benefit of his creditors, he is not to be regarded as a purchaser for valuable consideration, as against the creditors of Selmes, although the property assigned was the *bona fide* property of McFarlane. This is clearly inadmissible.

12th, The third of the refused instructions is liable to the same objection as

the second. It assumes, that the creditors of Selmes may pursue the property by attachment, that is, subject it to their demands, although it did not belong to Selmes, and was the property of another person, and that as against the creditors of that person for whose benefit he assigned it.

13th. Dickson unquestionably established a *prima facie* right to the property, by showing, that before the assignment it was in the store and apparent ownership of McFarlane; that it was conveyed to him, and possession taken, before the attachment: and certainly, if the possession of McFarlane, as owner, was with the consent of Selmes, and the ownership of Selmes (if it existed) was unknown to the creditors for whose benefit the assignment was made, Dickson's title, under the conveyance, is not impaired by the fact that Selmes was the real owner. Still less can the assignment be defeated, when the creditors, secured by it, became such in the course of business, relying upon the apparent ownership of the assignor, who was represented to be owner, by the real proprietor, and by the very creditors of that proprietor, who seeks to avoid the assignment.

TOMPKINS, J., *delivered the opinion of the Court.*

This was an action of assumpsit, brought by George Pomeroy against Selmes, in the Court of Common Pleas of St. Louis county. The declaration contained three counts, on three several notes, purporting to be made by one James McFarlane, to Selmes, the defendant, and by Selmes assigned to the plaintiff, Pomeroy, all bearing date in May, 1842. The common counts were also contained in the declaration. The plaintiff made affidavit, that he believed Selmes had fraudulently disposed of his property and effects, so as to defraud and delay his creditors, and procured an attachment to issue. The sheriff returned, that he had attached certain property as belonging to Selmes, the defendant, and read the writ to him, &c. At the return term of the writ, judgment by default was entered upon the instrument of writing sued on, for $913 49.

One Charles K. Dickson claimed the property attached, and interpleaded. Verdict and judgment for Dickson, the interpleader. Execution was issued by Pomeroy against Selmes on the judgment obtained against him, and it was returned, "No goods, chattels, lands or tenements found," &c.

Dickson, the interpleader, claimed the property attached, under a deed of assignment made to him by the said McFarlane, the maker of the notes, on which action is founded. The deed sets out, that McFarlane, being unable to meet all his debts, &c., and deeming it just and reasonable to give all his creditors an equal chance of payment, a general assignment of all his goods, &c., for the benefit of creditors, *pro rata*, &c., grants, bargains, conveys, assigns, transfers, &c., unto Dickson, &c., all his stock in trade, goods, wares and merchandize, debts, choses in action, &c., upon condition that Dickson sell and dispose of them; first, for the benefit of McFarlane's creditors, and then, if any balance be left, to refund it to McFarlane. After reading the deed of assignment, Dickson, the interpleader, examined seven witnesses, the object of whose testimony appeared to be, to prove

92

that Selmes commenced business in St. Louis in 1839, and continued it about one-and-a-half years, with McFarlane as his clerk; that, in the Spring of the year, 1841, McFarlane's name was used in the business; Selmes' sign was taken down, the goods removed to a house on the opposite side of the street, and McFarlane's name used, and his sign put up about the same time; that Selmes stated, that he sold out to McFarlane, and he also stated, as his reason for so doing, that he, Selmes, was greatly indebted in New York; that he wished to protect his St. Louis creditors with his property here; that he had been be-friended in St. Louis, by persons to whom he was then indebted, and had made much money in his business there.   One of these witnesses stated, that, " After the sale from Selmes to McFarlane, Selmes generally transacted the business, especially of buying goods, &c.; that whenever notes were given for the pur-chase of goods, after McFarlane's name was used in the business, McFarlane's name was generally signed as maker of the notes, and Selmes endorsed them." This witness stated, that he sold goods to Selmes for McFarlane; that he took notes from McFarlane to Pomeroy, the plaintiff, for goods sold, &c., which notes were endorsed by Selmes; the witness also stated, that after McFarlane had put up his sign as aforesaid, he had informed Pomeroy, the plaintiff, that Selmes had told him (the witness) about his affairs and business arrangements with McFar-lane.   Much other evidence was given by Dickson, the interpleader, to show that McFarlane bought much merchandize in his own name, for which he gave notes not endorsed by Selmes, and that he paid for goods also.   It was also in evidence, that Selmes, after the sale of his stock in trade to McFarlane, acted as clerk to McFarlane.   It was also in evidence, that the firm of Ruggles & Chase, before the sale by Selmes to McFarlane, had sold goods to Selmes, to the amount of $2,000, which was paid by him, and that after the transfer of the stock in trade by Selmes to McFarlane, the same firm had sold goods to McFarlane, and had received therefor McFarlane's notes endorsed by Selmes, and that the said firm had refused to sell to Selmes, on his own credit, after he had transferred his goods to McFarlane.

On the part of Pomeroy, the plaintiff, it was given in evidence that Selmes told two wholesale houses in St. Louis, while he was doing business in his own name, that he was much involved in debt in New York, and that he feared he should be interrupted on that account.   On this account, he afterwards stated to them he had transferred his goods to McFarlane, in order to protect his St. Louis creditors.   To one of these two houses, he confessed judgment for a much larger amount than he owed, in order to secure them as well for moneys already due, as for future liabilities..   It was testified that Selmes and McFarlane, in a conver-sation held with Johnstone, a partner in one of these houses, stated that the change from Selmes' name to McFarlane's was mere matter of form, to avoid Eastern creditors.   This witness (Johnstone) stated, that he was a confidant and friend of Selmes, and was advised with in relation to this change.   From the evidence, it appeared to be the practice of both of these wholesale houses to make both Selmes and McFarlane responsible, after the business was done under the name of McFarlane.   One of the witnesses, who had sold goods to Selmes before the

transfer to McFarlane, took a confession of judgment from both Selmes and McFarlane, to the amount of $15,000, for the purpose of securing him for goods, sold after the transfer to McFarlane, as well as for the previous indebtedness of Selmes. Other testimony was given by the plaintiff, Pomeroy, the object of which was to prove, that Selmes was the principal person in the business of McFarlane, although the business was done under the sign of McFarlane, and Selmes professed to be the clerk of McFarlane.

The plaintiff then prayed the court to give the instructions following, to wit:

1st. If they believe, from the evidence, that the goods assigned to Dickson were, at the time, the property of Selmes, they will find for the plaintiff in attachment.

2d. If they believe, from the evidence, that Dickson, the interpleader, only claims the property as assignee of McFarlane, for the benefit of McFarlane's creditors, he does not stand in the character of a purchaser for a valuable consideration against the creditors of Selmes.

3d. That, although Selmes, in this transaction, might not be able to control or annul his own act in the transfer of the property in question to McFarlane, yet the creditors of Selmes are not included, and such creditors may pursue the property by attachment, in the hands of any person not a *bona fide* purchaser.

The court refused to give these instructions.

The court then instructed the jury as follows:

1st. The interpleader establishes a *prima facie* right to a recovery, by showing that the goods were in his possession at the time of levying the attachment, by virtue of an assignment from McFarlane, and that the goods attached were goods which had been, previous to the assignment, in the store and apparent ownership of McFarlane.

2d. The fact, that McFarlane was not in fact the owner of the goods, but that they were put in his possession by Selmes, merely as a cover to protect them from the creditors of said Selmes, is not sufficient to defeat the interpleader's right of recovery, unless the jury believe that the exact position which the parties, Selmes and McFarlane, occupied, was of such general notoriety as to be known to all those who traded with and credited McFarlane, and particularly the creditors for whose benefit the present interpleader is trustee.

3d. If a man, for the fraudulent purpose of protecting his property from his creditors, puts it into the hands of another, who holds himself out to the world as the owner thereof, and goes into business, and trades with this property, with the consent of the real owner; and if such holder of the goods, while they are thus in his possession, makes a general transfer thereof, for the benefit of his creditors, which were creditors created in the course of such business, either entirely or partly, such transfer is good and valid, even as against the attaching creditor of the real owner.

The court gave these instructions as above-mentioned, and then it is added, " to all which instructions, and decisions, and refusals, the plaintiff, by his counsel, excepts."

The plaintiff moved the court for a new trial, for reasons common to all suits,

and therefore not necessary to be mentioned, and excepted to the overruling of his motion.

This suit was tried at the August term, 1842, and at the next term, to wit, at the November term of the said year, the bill of exceptions appears, from the record, to have been presented for the signature of the judge.   In 1 Bacon, 530, it is said, that although no time be appointed by the statute, yet the bill must be presented at the same term.   In 4 Peters, p. 107, the late Chief Justice Marshall says, "It would be dangerous to allow a bill of exceptions, of matters dependant on the memory, at a distant period, when they may not be accurately recollected, and the judge should not allow it."

To avoid the evils anticipated by the English courts, as well as those of the United States, from the neglect of the law-makers to declare at what time the bill is to be presented for the signature of the judge, and to leave as little room as possible to judicial discretion, our statute expressly provides, *that the exceptions shall be taken, and the bill presented, during the progress of the cause.*   (See act to regulate practice at law, sec. 20, art. 4, p. 464 of Digest of 1835.)   It would not, perhaps, be denied, that the bill might, by consent of parties, be presented for the judge's signature, even at the next term; but no such consent appears on record. For the construction given to the act, Consaul *vs.* Liddel, 7 Mo. Rep., 253, may be consulted; there the subject is more fully treated of.   But the plaintiff also moved for a new trial, for common reasons, one of which is, that the verdict is against evidence.   Although the bill of exceptions is wanting, and we have, properly speaking, neither evidence, nor exceptions to instructions, nor a motion for a new trial before us, yet it may not be amiss to take a view of the case, as presented by the evidence irregularly spread before us.

The plaintiff, here appellant, has proved to us that Selmes, the defendant, came to St. Louis in the year 1839, and expressed great solicitude to protect his creditors there from the claims sent against him by creditors left by him in New York; and for this purpose he, in the year 1841, sold, or offered to sell, to his clerk, McFarlane, all his stock of goods, and that stock being removed to another house, where McFarlane's sign was raised, the defendant (Selmes) there officiated as McFarlane's clerk.   The notes here sued on were made by McFarlane to Selmes, and by him endorsed to the plaintiff, Pomeroy, probably for the very goods which Pine, a witness for Dickson, says that he sold to Selmes, for McFarlane; for he adds, that he took notes from McFarlane to Pomeroy, the plaintiff, for goods sold, &c., which notes were endorsed by Selmes.   The witness further added, that after McFarlane put up his sign, as aforesaid, he had informed Pomeroy, the plaintiff, that Selmes had told him (the witness) about his affairs and business arrangements with McFarlane.   It is not in evidence, that either Dickson, or those for whom he is trustee, were affected with any notice that Selmes had made his arrangement with McFarlane to sell his goods, merely to defraud his New York creditors; but, on their part, all appears fair; whilst it appears that Pomeroy, the plaintiff, sold his goods to this same McFarlane, to be retailed out by him, in his own name, and as his own property, relying on Selmes as his security.   If the evidence even connected Selmes with McFarlane, as an associate

in a fraudulent design to cheat Pomeroy, he has no right to complain of Dickson, and those for whose benefit the assignment is made, so long as they are not proved to be privy to the fraud. Pomeroy not only had the notice which all the rest of the world had, that McFarlane was doing business apparently on his own account, and, consequently, could sell and dispose of the goods as he pleased, but he was also informed of the fraudulent intention of Selmes to cheat his New York creditors, through the instrumentality of McFarlane. The instructions asked by Pomeroy ought never to have been given, the evidence being such as it is; on the contrary, the instructions asked by the interpleader were correctly given. But the plaintiff seemed to believe that the verdict was against evidence. The verdict ought to have been against Pomeroy, on the proof furnished by himself, and his adversary, who labored with more understanding, placed the matter in a very clear light against him by the evidence of Pine, who declared that he had informed Pomeroy of the business arrangements of Selmes and McFarlane. This Court is little inclined to weigh the evidence in a cause, after it has been left to a jury, with correct instructions. But if the evidence in this case, instead of being very abundant in favor of the appellee, were even very strong against him, the plaintiff, has precluded this Court from giving him any relief. When the plaintiff seeks to reverse a judgment, because the verdict is found against the evidence, he ought to set out all the evidence given in the cause, and to state in his bill of exceptions that all the evidence given in the cause has been set out. It does not appear in this case, that the appellant did set out all the evidence; on the contrary, it appears that there was evidence which he did not state in the bill of exceptions, such as it is, filed at the term after the trial of the cause.

The judgment of the Court of Common Pleas must be affirmed.

SCOTT, J.—In my opinion, Selmes and Pomeroy should have been regarded as partners, and the question would have arisen as to the right of one partner to make an assignment. About this, no opinion is given. The bill of exceptions not having been filed until a subsequent term, without the consent of parties, the judgment must be affirmed.