A. B. SMITH and E. K. SMITH, Partners, Doing Business Under Firm Name of A. B. SMITH LUMBER COMPANY, Appellants, v. OHIO MILLERS MUTUAL FIRE INSURANCE COMPANY.—6 S. W. (2d) 920.

Court en Banc, May 18, 1928.

148

*Ward & Reeves* for appellants.

*Samuel A. Harper* and *Shepard & Hawkins* for respondent.

*Ward & Reeves* for appellant in reply.

ELLISON, C.—Suit on fire insurance policy for $25,000, for loss of lumber and timber products destroyed by fire in plaintiffs' Yard No. 6 at Bragg City, Missouri. The plaintiffs, husband and wife, are partners in an extensive lumber business under the firm name of A. B. Smith Lumber Company, with chief offices at Paducah, Kentucky. The defendant is an Ohio insurance corporation, licensed in this State. On motion of the defendant the circuit court directed a reference of the cause over plaintiffs' objections and exceptions. The referee found the issues of fact and law for the defendant, and the trial court rendered judgment thereon. The plaintiffs have appealed. The grounds assigned are (1) that the circuit court erred in sending the case to a compulsory reference; (2) that the finding of the referee was against the law and the evidence; (3) that the court erred in admitting hearsay testimony and testimony offered by the respondent for the purpose (appellants assert) of contradicting its own witnesses. The other assignments made are really embodied within these three. The respondent makes the points that appellants' term bill of exceptions, covering the appointment of the referee, and the final bill of exceptions, were not filed in time.

156

The petition is in the usual form. The answer is long and full of repetitions. It covers fourteen pages of the printed abstract. Boiled down, the defenses are three, the first being a general denial, except as to the incorporation of the defendant and the issuance of the policy.

Next, it is alleged that, unknown to the respondent, the broker (a man named Auber Smith, no kin to the appellants) through whom the policy was issued was the salaried employee of appellants, and their agent and representative in insurance matters; that, while holding himself out to the respondent as a distinterested broker, but being also in fact in appellants' employ, he delivered the policy without collecting the premium and conspired with appellants to set up a series of confused mutual accounts between them, designed to make impossible of determination whether the premiums on the policies written by him for appellants were in fact paid or unpaid, so that if loss occurred under respondents' policy appellants might claim the policy in force and the premium paid, but if no loss occurred they might withhold payment of the premiums and thereby get the benefit of insurance coverage without paying therefor. Because of this alleged dual agency and double dealing it is charged the policy was void *ab initio* and that the appellants are estopped to claim under it, and its cancellation is prayed.

Finally, it is recited that long after the issuance of the policy on October 26, 1920, and long before the fire, which occurred June 8, 1921, the respondent cancelled the policy on March 16, 1921, for non-payment of the premium, first giving appellants due written notice thereof; that appellants and the broker remained silent and made no protest against said cancellation, or pretense to respondent that the premium on the policy had been paid, until *after* the fire. For these reasons it is asserted the policy was not in effect when the loss occurred, that appellants are estopped to claim thereunder, and that by reason of all the foregoing facts the respondent was under no duty to refund the unearned portion of the premium to make the cancellation effective, even if it be true that appellants had previously paid to the broker, Auber Smith, money on said fraudulent account without respondent's knowledge.

To make out their prima-facie case the appellants did not take the stand. They introduced the policy, proved the destruction of the insured property by fire, its value, and showed proof of loss had been made as the policy required. To establish its defense the respondent relied on the deposition of its president, William H. Clark, but was also forced to use the depositions of its adversaries, the two appellants, and the broker, Auber Smith. Three other depositions taken in New York were introduced, but they concerned matters less directly involved.

The facts shown, as briefly as possible, were that in the spring of 1919 Auber Smith entered appellants' service as a general detail man and office efficiency expert to revise their bookkeeping system and the form and manner of reporting operations from appellants' branch enterprises, and to perform any other duties assigned to him. For the previous sixteen years he had had an insurance brokerage business, which he continued to conduct separately. For that purpose he was assigned a separate room in appellants' office suite in which he installed his own furniture, insurance records, etc. He paid appellants $25 per month office rent and received from them a salary of $3000 per year, which was increased to $5000 in 1920 and reduced to $4200 in 1921. He gave about half his time to his own business and half to appellants'. The appellants also paid the salaries of his two clerks, and they, likewise, put in their extra time working for appellants. He had from 300 to 500 insurance customers, but from a fourth to a third of his insurance was written for appellants alone.

Auber Smith did not necessarily attend to all of appellants' correspondence about insurance, but if a letter was from one of his insurance companies he answered it, and while there was no absolute rule he ordinarily handled appellants' insurance matters as their employee—under the direction of the appellant A. B. Smith. If an inventory disclosed unprotected lumber stock or merchandise he would ask A. B. Smith if additional insurance was desired. When the fire occurred, as appellants' employee, he attended to the details of the settlements with other insurance companies and went on the ground when the loss was adjusted. He said when he placed insurance as a broker the insurance company would charge him with the premium on his own individual credit, usually on sixty or ninety days' time, and he in turn would charge the customer and give credit. He stated positively the appellants had no interest or voice in his insurance business and received no special favors; but in 1920 and 1921 times were hard, and between November, 1920, and May, 1921, they owed him from about $5000 to as much as $13,000 for insurance premiums.

Respondent's first policy in favor of appellants was placed by Auber Smith in the spring of 1920, about a year after the foregoing plan was put into operation. At that time he took out a license as an insurance broker under the Missouri statutes, and received from respondent the usual commission of ten per cent. Respondent did not know him or appellants or of the relations between them. The policy in suit was one of seven policies taken out in October and November, 1920. The premiums aggregated $2026.89. Less ten percent broker's commission, the amount due respondent was $1824.20. Twice in February, 1921, the respondent wrote Auber Smith asking

payment of the premiums. He did not answer the letters, so respondent wired for appellants' address in order that the policies might be cancelled. Auber Smith telegraphed back asking that the matter be held up pending receipt of his letter. He wrote respondent the next day, March 4. The letter was signed in his name at his direction by Edna K. Smith, one of the appellants. His explanation, and hers, was that when he would dictate letters and then be absent from the office Mrs. Smith would sign them for him, but she said she did not read them. The letter was as follows:

"It is needless to tell you the condition of the lumber business at the present time, and the trouble that the lumber men are having to meet their obligations as they should. The insurance I have with you is for the A. B. Smith Lumber Co., and I had hoped from day to day to have a check from them which would enable me to meet my balance with you.

"These good people advised me today that they are absolutely unable to make their collections, having about $65,000 outstanding with the railroad companies, and have had that amount for some months past. These railroad companies are not paying any bills at all and all-told they have outstanding something like $125,000 to $140,000 good collectible accounts which they cannot realize upon. They have hope that the Government will relieve to some extent the railroad companies, since a bill was passed and signed recently at Washington, ordering the Government to pay over to the railroads a partial payment on the indebtedness due them. This *we* look for from day to day and if it is paid naturally they will be enabled to pass the money along, and at that time *we* can take care of the indebtedness due you.

"This Lumber Company has offered to give me their ninety-day to four-month paper at eight per cent for the amount they are owing as they are quite positive that by that time the financial situation will have been relieved to such an extent that they will be able to take up their obligations as they become due.

"Of course, I could not handle this paper myself, but if it will be a benefit I would be glad to take same and pass it on to you, let you discount it there and you may rest assured, Mr. Clark, that it will be taken up when the time comes for payment. If this is not satisfactory I should like very much for you to withhold cancellation until it becomes possible for the railroads to meet their obligations with the company, when your account will be paid promptly.

"By reference to the commercial agent's reports on this lumber company I believe you need have no fear of the account being paid by one or the other of the above methods and I feel that, if it can be done, *we* could handle the matter along the above line and it might be better than to have to take up the policies. I should be

very glad indeed to hear further from you and you may wire me at my expense what will be your pleasure in the matter.'' (Italics ours.)

The respondent replied promptly, declining to give further time for the payment of the premiums or to take appellants' notes therefor, and said that unless advised by wire that the check for the premiums was forthcoming the insurance would be cancelled. Hearing nothing further, on March 10 respondent sent a registered letter direct to appellants at Paducah, Kentucky, plainly and explicitly notifying them that the seven policies hereinbefore mentioned were cancelled, effective March 16 at noon, and requesting appellants to get insurance elsewhere and to return the seven policies, together with a check for $776.93 premiums earned to the date of cancellation. The United States Post Office registry receipt showed this letter was received by the A. B. Smith Lumber Company on March 12, 1921. Following that, on April 12, April 19, May 7 and May 11 the respondent wrote Auber Smith calling his attention to the fact that the policies had been cancelled and asking payment of the earned premiums. No reply to any of these letters was ever received by respondent either from Auber Smith or from appellants.

As stated, the fire occurred on June 8. On June 10 appellants wrote the respondent advising it thereof and asking for an adjustment. Respondent immediately replied by letter dated June 13 (Exhibit 17) emphatically denying liability, because the premium on the policy had not been paid, in consequence of which it had been cancelled on the previous March 16. Thereupon, on June 21, Auber Smith wrote the respondent as follows:

''You will find herewith my check in the sum of $1824.20 in payment of my balance due you which is considerably past due.

''I regret very much the delay in getting this to you, *but apparently there was a mix-up in this payment, which was made to me quite a long while ago.*'' (Italics ours.)

The next day, June 22, appellant A. B. Smith wrote the respondent answering its letter of June 13 (Exhibit 17) declaring appellants' records would show they had paid the premium on the policy to Auber Smith before January 1, and if Auber Smith had not remitted to the respondent it was his fault and not appellants'. To this respondent replied on June 27 asking appellants why—if they had paid the premium to Auber Smith before January 1—they had remained mute since notice of cancellation of the policy was received by them by registered letter on March 12.

Answering that letter appellants wrote respondent stating they were advised by attorneys that it (respondent) was liable because it had not tendered back the unearned portion of the premium when the policy was cancelled, and because appellants' payment of the

premium to Auber Smith was a payment to respondent, since Auber Smith was respondent's agent and not appellants' for the collection of the premium. The letter went on to say the premiums on the seven policies had been paid in November and December, 1920, and added:

"You ask the question why we did not advise you of this fact when cancellation notice was received in March. So far as this notice having been a cancellation notice, we were not aware of that fact, but merely assumed it was a notice that the premium had not been paid to you by Mr. Smith. This was no affair of ours, therefore, it was not necessary for us to advise you."

The letter from which the above is quoted was written by appellant A. B. Smith. It will be seen he admits receipt of the registered letter cancelling the policies and knowledge of its contents, and yet, on the stand he denied ever seeing the letter, as did Edna K. Smith, the other appellant. Likewise, notwithstanding all the letters from respondent to Auber Smith regarding the cancellation of the policies and demanding payment of the earned premium, and notwithstanding Auber Smith admitted on the stand the letters were true and correct, he testified *he did not know the policy was cancelled until after the fire,* and said his attention was first called to the fact by respondent's letter, Exhibit 17, written on June 13.

Referring to the evidence concerning the alleged payment of the premiums by appellants to Auber Smith. He testified the seven policies were received from respondent by mail on November 7. Two days later on November 9 he needed $1150 to take care of an outstanding check to another insurance company. Whenever he was out of funds it was his practice to pick out invoices or bills for specific insurance policies furnished to appellants, as nearly as possible equalling the amount of money he wanted, and to take them to appellants and ask for a check. On this occasion he asked appellants for the $1150 and told them to credit it as a payment on the $2026.89 premiums due on the respondent's seven policies. This was two days before he had rendered a bill for the policies. Both appellants corroborated Auber Smith in the foregoing. None of them were asked to explain more fully why this particular bill was selected for credit when it had not yet been made out, and did not fit the amount of money Auber Smith wanted, and when appellants then owed him about $5000 on older invoices.

Again on November 23 Auber Smith was in need of money. He wanted $750. So he went to the appellant A. B. Smith to get it. The balance yet due on the seven policies was $876.89 ($2026.89 minus $1150), and he intended to credit the $750 on this balance. But when he talked to A. B. Smith the latter said he wanted to have a settlement for the office rent, which Auber Smith had not paid since

moving into the office in May, 1919. It had been running over eighteen months at $25 per month, making more than $450. If this rent were deducted from the $876.89 balance due on the policies it would only leave a little over $400 in cash going to Auber Smith, and this was not as much as he needed. So he got another invoice of $375.50 for insurance premiums due from the Southern Pine Manufacturing Company, one of appellants' subsidiary concerns, and they included that invoice in the settlement. The $876.89 balance due on respondent's policies and the $357.50 due on the Southern Pine policies made $1234.39. The rent due from Auber Smith to appellants, figured down to the exact penny on that day, November 23, amounted to $468.89. Subtracting the rent left a balance of $765.50 cash required to settle both policy invoices. So appellant A. B. Smith gave Auber Smith a check for that amount. The $468.89 rent and $408 of the $765.50 check were to be credited on the $2026.89 premiums due on respondent's policies, paying them in full, and $357.50 out of the check was to go on the Southern Pine Manufacturing Company policies, paying them in full. That was the testimony of both Auber Smith and A. B. Smith.

Regarding the crediting of these payments on Auber Smith's books. He had three accounts with appellants (perhaps others; three were offered in evidence). One was with them in their trade name "Southern Pine Manufacturing Company." The part introduced ran from May 18, 1920, to September 22, 1921, and contained seventeen debit items and four credit items. Another was carried in appellants' partnership name, A. B. Smith Lumber Company, and ran from October 1, 1920, to December 31, 1920. It contained twenty-nine debit items and eight credit items. The third was a duplicate account with the lumber company, called a policy record. This account ran between May 8, 1920, and December 31, 1920, and contained forty-one debit items and thirteen credit items. All these accounts listed policies of insurance furnished by Auber Smith to appellants, giving the date of each and the amount of the premium. The policies were in many different companies, but the seven policies in the respondent company were among those listed in the two A. B. Smith Lumber Company accounts.

An examination of the accounts shows they conform to the foregoing testimony of Auber Smith and A. B. Smith this far—the Southern Pine Manufacturing Company account bears a credit of $357.50 on November 23, 1920, and the two A. B. Smith Lumber Company accounts show a credit of $1150 on November 9 and a credit of $408 on November 23, but none of these credits indicate what policies were to receive the benefit of the payments. They were simply general credits to the whole account. The lumber company accounts do not show a credit of $468.89 on November 23 or

any other date. There is a credit of $500 office expense on December 31. Auber Smith explained this by saying when his clerk computed the office rent on November 23 he forgot to enter it on the books, and when the oversight was discovered the next month, it was put down for the whole amount due to the end of the year.

There is another discrepancy. A computation of the rent from May 1, 1919, to November 23, 1920, at $25 per month does not come to $468.89. It would either be $468.33 or $469.17, according as twenty-two days or twenty-three days befigured for the month of November. This slight difference ordinarily would not be material, but in this instance Auber Smith testified the rent was computed very accurately, to the penny, so as to balance the books and pay the premiums in full, and yet allow him the money he wanted.

The respondent introduced a deposition taken in New York showing that Auber Smith had placed five insurance policies for appellants with the Stuyvesant Insurance Company, a wholly different concern from respondent, on which the premiums were $765.50, the exact amount of the check given to Auber Smith by appellants on November 23. Three of these policies were in favor of the Southern Pine Manufacturing Company and the premiums on them were $357.50. Two of the policies were in favor of the A. B. Smith Lumber Company and the premiums on them were $408. On November 23, the very day that Auber Smith received the $765.50 check from appellants, he paid these five premiums to the Stuyvesant Insurance Company—that is, he took up a check he had previously given that company for the premiums less his commission, etc., and the two Stuyvesant policies to the A. B. Smith Lumber Company were marked "Pd." on his books. The inference from all this was that the $408 with which Auber Smith's book accounts against appellants were credited on November 23 represented a payment of the premiums on the two Stuyvesant policies, and not a payment of the balance due on respondent's policies. Auber Smith admitted the $1150 paid him by appellants was not applied by him on respondent's policy premiums, though he and appellants insisted that as between themselves he received it for that purpose. The New York depositions showed what he did with the money. Appellants' theory was that Auber Smith was an independent contractor, indebted personally, on his own account, for the premiums on policies placed by him in each company, and that he, in turn, individually extended credit to the policyholders, so that he could do what he pleased with the money they paid him.

The referee found appellants did in fact pay the premium on the policy in suit to Auber Smith, but that Auber Smith was a dual agent of both appellants and respondent at the time, without the latter's knowledge or consent. For this reason the referee reported

the conclusion of law that the payment of the premium to Auber Smith was not binding on respondent and was not a payment to respondent, and recommended that judgment be rendered for the defendant. This, as heretofore stated, the trial court did.

I. The first question to be determined is whether the failure to file a term bill of exceptions within the time allowed by the court has foreclosed appellants' right to urge the assignment that the circuit court erred in directing a compulsory reference of the cause. The referee was appointed on April 10, during the March term, 1922, of the circuit court. The appellants objected and excepted and were allowed ten days in which to file a term bill. They did not file it until January 7, 1924. The final bill, filed more than two years later, did not include the same matter.

Appellants earnestly insist that Section 1460, Revised Statutes 1919 (a reenactment of Sec. 2029, R. S. 1909, by Laws 1911, p. 139), allows no distinction between term and final bills, and permits all bills of exceptions to be filed within the time therein specified, namely, any time before the appellant is required to serve his abstract of the record for the appeal. The point has been before the appellate courts of this State several times, and the holdings have all been contrary to appellants' contention. It has been expressly ruled that the present statute did not abolish term bills of exceptions, with their incidents. [State v. Lando (Mo.), 300 S. W. 767, 768; Kline Cloak & Suit Co. v. Morris, 293 Mo. 478, 493, 240 S. W. 96, 99; State ex rel. v. Southern Surety Co. (Mo. App.), 294 S. W. 123, 125; State v. Boswell (Mo. App.), 272 S. W. 982, 983; State ex rel. v. John Gill & Sons Co. (Mo. App.), 220 S. W. 978, 980.] And term bills have been required without specific reference to the statute. [Kinney v. State (Mo.), 285 S. W. 87, 88; State v. Zugras, 306 Mo. 492, 496, 267 S. W. 804; Dalton v. Simpson, 270 Mo. 287, 302, 193 S. W. 546; State ex rel. v. Robinson, 257 Mo. 584, 591, 165 S. W. 997; Sweeney v. Sweeney (Mo. App.), 283 S. W. 736, 738; Mississippi Valley Trust Co. v. Franke, 216 Mo. App. 466, 471, 268 S. W. 420; Duncan v. Smith (Mo. App.), 226 S. W. 621, 622; Beall v. Ingersoll, 203 Mo. App. 555, 563, 219 S. W. 672; Case v. Jefferson City Bridge & Transit Co. (Mo. App.), 211 S. W. 99, 100; Brannock v. Jaynes, 197 Mo. App. 150, 160, 193 S. W. 51.]

The question is one of practice, constantly recurring. Our belief is that appellants are right. and because of the practical importance of the matter we feel we should give expression to our views, notwithstanding the many decisions to the contrary. We shall not set out the statute, owing to its length. It will be necessary to refer to it in connection with the opinion.

Prior to 1855 the only statute on the subject was very much like our present Section 1459, Revised Statutes 1919, it being provided substantially, that whenever, in the progress of any trial in any civil suit pending in any court of record, either party shall except to the opinion of the court and write his exception and pray the court to allow and sign the same, the person composing the court shall sign the bill, if true. It was held to require bills of exceptions to be filed during the trial. [Consaul v. Lidell, 7 Mo. 250, 254; Pomeroy v. Selmes, 8 Mo. 727, 732.] The reason for the rule was said to be that "it would be dangerous to allow a bill of exceptions, of matters dependent on the memory, at a distant period, when they may not be accurately recollected." [Pomeroy v. Selmes, supra, quoting (inaccurately) from the opinion of Chief Justice MARSHALL in Ex parte Martha Bradstreet, 29 U. S. (4 Peters) 102, 106.]

The statute just mentioned was Section 27, page 1264, in Revised Statutes 1855. In that revision a new section, Section 28, was added immediately following. It was the progenitor of the present Section 1460, Revised Statutes 1919, and contained less than five lines. Conforming to the practice which had grown up under sanction of the case law, it provided: "Such exceptions (referring to Section 27) may be written and filed at the time, or during the term of the court at which it is taken, and not after. All exceptions taken during the trial of a cause or issue before the same jury, shall be embraced in the same bill of exceptions." In other words the appellant was allowed to the end of the term, instead of the end of the trial to file his bill.

But the hardship of the statute was still such that notwithstanding its positive injunction an appellant was permitted to file his bill after the term by consent of the other party and of the court, entered of record during the term (McCarty v. Cunningham, 75 Mo. 279) ; and in 1885, Laws 1885, page 214, the necessity of obtaining the consent of the opposing party was dispensed with. The words "and not after" were stricken from the section and in lieu thereof were inserted the words "or within such time thereafter as the court may by an order entered of record allow." Following these words. in the revision of 1889, Section 2168, Revised Statutes 1889, the further provision was added that the time allowed by the court might be extended by the court or judge in vacation for good cause shown, or that the time might be fixed by stipulation of the parties or their counsel, etc. This is the history of the first nine lines and the last two of the present statute down to the time of its reenactment in 1911.

The Act of 1911 added the two provisos. The first, condensed, is that in all cases pending on appeal to the Supreme Court or either of the courts of appeals the bills of exceptions may be allowed and

filed at any time before the appellant shall be required by the rules of the particular appellate court to serve his abstract of the record, as determined by the docket of that court. The second proviso tells when and how the time thus fixed may be further extended, and then concludes: ''Hereafter no case now or hereafter pending in any appellate court shall be affirmed for failure to file a bill of exceptions within the time allowed by the trial court, . . . '' Following this are the two lines which have always been at the close of the section since its first enactment in 1855, that all exceptions taken during the trial of a cause or issue before the same jury shall be embraced in the same bill. The act concluded with an emergency clause reciting that because many judgments were being affirmed for want of a bill of exceptions filed within the time allowed by the trial court, without consideration of the merits, an emergency existed, etc.

It has been said the statute, built up as it is of amendments from time to time, permits of no construction which will give effect to every part. [State ex inf. v. Sweaney, 270 Mo. 685, 689, 195 S. W. 714.] But its object and purpose seem clear. It expressly forbids summary disposition of a cause on appeal for want of a bill of exceptions filed within the time allowed by the trial court. Before the Act of 1911 the statute was held to apply to term bills as well as final bills (State ex rel. v. Robinson, supra, 257 Mo. 1. c. 591); why should not the present law embrace them? Of course it does, as is attested by the almost daily practice of granting leave to file term bills after the term. This is done solely under authority of the provision in the opening lines of Section 1460. There is no other statutory warrant for it. Does it not follow, then, that the later provisions of the same statute should be observed in determining the validity of a term bill filed out of time (as fixed by the trial court)?

It may be objected that if term bills and final bills of exceptions can be filed at the same time there is no reason for having more than one bill, whereas the statute appears to contemplate otherwise. Its closing lines are that all exceptions taken during a trial before the same jury shall be embraced in the same bill, thus indicating there may be other bills. Whatever incongruity results from the retention of that particular sentence, it cannot by implication overcome the prior specific and positive provisions with reference to the time of filing. Furthermore, our construction does not emasculate it. For the trial of a single cause of action in the same court there would seem to be no *need* for more than one bill of exceptions for the entire proceeding; but this court will not refuse to look at more than one bill (State ex rel. v. Robinson, supra, 257 Mo. 1. c. 592; Dean v. Wabash Ry. Co., 229 Mo. 425, 439, 129 S. W. 953, 956); and sometimes more than one bill *must* be filed, as where a change of venue is taken and

exceptions are saved in both courts. [Cantwell v. Columbia Lead Co., 199 Mo. 1, 38, 97 S. W. 167.] It seems this is also true where the verdict and judgment on a plea in abatement in attachment are adverse to the plaintiff (Sec. 1766, R. S. 1919), though in that instance the bill must be filed within the time required by the statute. The statement in Manthey v. Kellerman Contracting Co., supra, 311 Mo. 147, 155, that "the law now allows only one bill of exceptions," is to be interpreted with its context, and means only that as between appellants and respondents there can be but one bill.

Exceptions are no longer written out in long hand and from memory. The rulings on motions and preliminary applications are noted on the court docket or minutes. The testimony is taken in shorthand and transcribed by official court reporters. The tendency through the years, as we have seen, has been to relax the rigor of a rule which once was founded in necessity, almost, but is not now. The reason for term bills no longer exists. We hold the appellants' term bill was filed in time and that the cases cited at the beginning of this discussion should be no longer followed.

II. There is another preliminary question. Respondent has filed a motion to strike out the final bill of exceptions on the ground that it was not filed in time. The appeal was by the short form of transcript authorized by Section 1479, Revised Statutes 1919. The cause was originally docketed for hearing in this court on April 21, 1926. Under Rule 11 the last day for service of appellants' abstract was thirty days before that, which would have been March 22, and under Section 1460 the time for filing the bill of exceptions was any time before that day. But the bill was not filed in the circuit court until June 3, 1926. However, in the meantime on April 12 the parties signed a stipulation agreeing to the continuance of the cause to the October term of this court and the stipulation was filed and the order of continuance entered on April 12. Under these facts the bill was filed in time. The date on which the cause was *reset* for hearing fixed the time for serving the abstract (Watts v. Kerr (Court en Banc), 287 S. W. 337, 338), and hence the time for filing the bill.

III. With these questions out of the way, we come to the decisive point in the case, which is whether the cause was properly subject to compulsory reference. The statute (Sec. 1426, R. S. 1919) says, among other things, that the court may direct a compulsory reference "where the trial of an issue of fact shall require the examination of a long account on either side. . . . " It is said in 34 Cyc. 784: "The term 'examination

of a long account' as used in the statutes does not mean the examination of it to ascertain the result or effect of it, but the proof by testimony of the correctness of the items composing it. The mere fact that entries in books of account will be put in evidence does not make the action one necessarily requiring the examination of a long account.'' The cases cited are Magown v. Sinclair, 5 Daly (N. Y.) 63; Streat v. Rothschild, 12 Daly (N. Y.) 95; Reiser v. Plath, 13 N. Y. Supp. 272. We shall not attempt to discuss them other than to say they clearly sustain the text. We have in this State cases to the same effect. [National Bank of Commerce v. Laughlin, 305 Mo. 8, 31, 264 S. W. 706.] The *correctness* of the account must be directly and not collaterally involved. It is, furthermore, the rule that whether an account is thus put in issue in the statutory sense, must be determined from the pleadings. [23 R. C. L. sec. 7, p. 290; Kenneth Inv. Co. v. National Bank of the Republic, 96 Mo. App. 125, 133, 70 S. W. 173.]

We are forced to the conclusion that, measured by these standards, the trial of the issues did not involve the *examination* of the accounts. The petition was a straight declaration on an insurance policy, and of course did not bring the accounts into the case. The policy was a written contract promising to pay money and imported a consideration. [Sec. 2160, R. S. 1919; Swift v. Central Union Fire Ins. Co., 279 Mo. 606, 610, 216 S. W. 935.] The defense of want or failure of consideration was an affirmative defense and could not be shown under a general denial. [Sec. 1404, R. S. 1919; Doan v. Moss, 20 Mo. 297; Woodin v. Leach, 186 Mo. App. 275, 281, 172 S. W. 62; 13 C. J. p. 740, sec. 885, p. 742, sec. 888; 31 Cyc. p. 696.] It can be safely said, then, that that part of the answer did not challenge the correctness of the account.

The remaining pleas in the answer were directed to the result or effect of the account as a whole by reason of the way it was kept and not to the correctness of its items. It is charged, in substance, that the broker and the appellant conspired to keep the account in such manner that it would be impossible to tell to what policy premiums the credits were referable, so that the appellants could claim in the event of a loss under any particular policy that the money had been paid in to apply on *that* policy. The answer does say the premium was never paid to the respondent, and in that sense denies payment, but puts it on the ground that Auber Smith was a dual agent and conspirator with appellants, in consequence of which respondent was not bound by the payment to him, if any. The issue tendered does not involve auditing of the account but raises, rather, a question of agency, and makes the case very like Magown v. Sinclair, supra, 5 Daly (N. Y.) 63. Furthermore, so few of the items had any relation to the case that we hardly think it can be fairly said the questions would have been confusing to a jury. A com-

pulsory reference encroaches on the constitutional right of trial by jury, and ought not to be allowed unless the cause comes within the spirit as well as the letter of the statute. [Browning v. North Mo. Central Ry. Co., 284 Mo. 439, 446, 224 S. W. 748.] For these reasons we think the trial court erred in directing a compulsory reference.

On the question just disposed of appellants give great prominence in their briefs to the point that the account here involved was between them and a *third party,* Auber Smith, and not between *the parties to the action.* They say unless an account be of the latter character it will not authorize a compulsory reference. Such seems to be the general doctrine (Father Matthew Young Men's Society v. Fitzwilliams, 12 Mo. App. 445, 447, 84 Mo. 406; Fromer v. Ottenberg, 36 N. Y. Misc. 631, 632); but we do not regard it as of persuasive importance in this case. The reason for the rule is that ordinarily an account with a third party can only be indirectly or collaterally involved in the action. It is merely evidence on the main issue. But here, if Auber Smith acted as agent for respondent in receiving payments from appellants for its benefit and crediting them to the account, the account was to that extent really between appellants and respondent in a beneficial sense. It would be a harsh rule which would make the account binding on respondent and at the same time deny it an audit by reference, the facts otherwise permitting.

IV. As the cause will have to be reversed and remanded it seems better to refer to one or two questions which will come up on a retrial. Appellants argue that since respondent made appellants and Auber Smith its own witnesses, it vouched for the truth of their stories; and since they testified appellants paid the premium to Auber Smith as agent for respondent, therefore respondent is paid and has no case. We do not agree to this. Part of Auber Smith's other testimony showed he acted for appellants in insurance matters, and the testimony of these three witnesses in connection with the documentary evidence discloses many serious contradictions and discrepancies the effect of which is to lend support to respondent's theory. Some of these we have heretofore indicated. This evidence must be taken altogether. There is nothing in the law counter to the biblical admonition, "By thy words thou shall be condemned," [Matt. XII, 37.] Under the statute when a litigant puts his adversary on the stand he is permitted to interrogate him under the rules applicable to cross-examination (Sec. 5412, R. S. 1919) and, as was said in Black v. Epstein, 221 Mo. 286, 304, 120 S. W. 754, 760: "The rule applicable to this proposition is that where one party calls the other as a witness he will not

be allowed to directly impeach his credibility, but where the evidence of such witness is contradictory, tending to show that the witness is inclined to prevaricate and what he says is not strictly in accord with the truth, the court or jury will still be authorized to place the proper estimate on it.'' [See also, Spencer v. Anderson (Mo. App.), 229 S. W. 226; Becker v. Koch, 104 N. Y. 394, 10 N. E. 701, 58 Am. Rep. 515; Dumas v. Clayton, 32 D. C. App. 566, 574; Krull v. Arman, 110 Neb. 70, 192 N. W. 961, 962; Campbell v. Berryman, 256 Fed. 402.] There appears to be no reason why the same rule should not apply to other unfriendly witnesses, though they be not parties to the suit. In fact it is so applied in Becker v. Koch, supra, where the question is ably and fully discussed.

There was an issue in the case as to whether Auber Smith was an independent contractor, within the meaning of that expression as used in Leader Realty Co. v. Markham, 163 Mo. App. 314, 324, 143 S. W. 1104, 1107, or whether he was agent for respondent only, or a dual agent for both appellant and respondent without the knowledge of the latter. If he assumed to represent both appellants and respondent in the same matter wherein their interests were conflicting, namely, payment of the premium, without the respondent's knowledge or consent, the respondent was not bound by the payment. [Mercantile Mutual Insurance Co. v. Hope Ins. Co., 8 Mo. App. 408, 410; Huggins Cracker and Candy Co. v. Peoples Ins. Co., 41 Mo. App. 530, 541; Shutts v. Milwaukee Mechanics Ins. Co., 159 Mo. App. 436, 439, 141 S. W. 15, 16; 21 R. C. L. sec. 11, p. 827; 32 C. J. sec. 130, p. 1055, sec. 149, p. 1071.] These were questions of fact largely dependent on the intention of the parties (Farber v. American Automobile Ins. Co., 191 Mo. App. 307, 321, 177 S. W. 675, 679); and notwithstanding Auber Smith is frequently referred to in the testimony as a ''broker'' rather than as an ''agent,'' we think his testimony and that of appellants and Auber Smith in connection with the other evidence, was sufficient to take the issue of dual agency to the triers of fact, as well as the question whether the payments made by appellants to Auber Smith were, or were not, intended by appellants to be applied on respondent's policies. It has been said implications and inferences alone will not sustain a finding (Keim v. Blackburn (Mo.), 280 S. W. 1046, 1048), but when accompanied by relevant testimony of a probative character the contrary is true. And when the power of disproving a fact is peculiarly within possession of the other party and he fails to bring forward satisfying evidence, slight circumstances will be sufficient to establish it. [Davenport v. King Elec. Co., 242 Mo. 111; 122, 145 S. W. 454, 456.] In so ruling it is to be understood we are not passing on the weight of the evidence,

We hold merely that respondent's showing was of sufficient substance to warrant the submission of its affirmative defense.

V. Appellants objected to the introduction of the long letter of March 4 from Auber Smith to respondent, hereinbefore set out, on the ground that it was hearsay and irrelevant. This was the letter to which the appellant Edna K. Smith signed Auber Smith's name. If Auber Smith was acting as appellants'. agent in the payment of the premium his contemporaneous statements and admissions in that regard were competent against them as principals (2 C. J. 939, sec. 695; 22 C. J. 367, sec. 540); and we have already held there was enough proof to make a prima-facie case that he was their agent. But, technically the letter was open to objection, in this—that it was prematurely offered before the other depositions, tending to show the agency, had been put in. The latter should have come first in the order of proof. [Williams v. Edwards, 94 Mo. 447, 451, 7 N. W. 429, 430; 2 C. J. sec. 695, p. 940.]

Objection also was made by appellants to several letters written by respondent, three of them to Auber Smith and one to appellants, that they were hearsay and self-serving. Without extending the opinion by referring to the contents of these letters, we shall simply say the objection was well taken as to exhibits 9, 23 and 24, but not good as to exhibit 15. The letters were all written by Wm. H. Clark, respondent's president, who was a witness. They were offered as a part of his testimony. Respondent was entitled to prove by him the *fact* that it had written refusing to extend the time of payment of the premium or to accept a note for it, that it repeatedly referred to the cancellation of the policies in subsequent correspondence and requested payment of the earned premium, and that after the fire it asked appellant A. B. Smith why he had not more promptly disclosed his alleged payment of the premium to Auber Smith, in reply to which A. B. Smith wrote back admitting he had received the registered letter containing the notice of cancellation, etc. But it was improper to permit the witness Clark, by introducing the letters, to prove his prior extra-judicial, self-serving statements in an argumentative strain concerning these matters, instead of the facts themselves. The letter, exhibit 15, was limited to a statement of the fact sought to be shown by it and was unexceptionable. [State v. Carl Wright, 319 Mo. 46; McCormick v. Travelers Ins. Co., 215 Mo. App. 258, 274, 276, 264 S. W. 912, 922; Ede v. Ward, 32 S. D. 351, 143 N. W. 269, 271; Welch v. Newbold, 184 Ill. App. 36.]

Appellants further complain that the facts sought to be established by the foregoing letters were incompetent because they "could have no other effect than to attempt to contradict" respondent's own wit-

ness—appellants and Auber Smith—and that this is also true of the New York depositions which showed what Auber Smith did with the money paid to him by appellants. This objection is not good. As said in Black v. Epstein, supra, 221 Mo. l. c. 304, a party may not *directly* impeach his own witness, but it does not follow that he cannot introduce other evidence, if of independent probative force, even though it be contradictory of what the witness said. [Maginnis v. Mo. Pac. Ry. Co., 268 Mo. 667, 675, 187 S. W. 1165.]

For the reasons given, the cause is reversed and remanded. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—This cause having come into Court en Banc, the opinion of ELLISON, C., heretofore delivered in Division One, is adopted as the decision of Court en Banc. All of the judges concur except *Walker, C. J.,* who dissents.