LENA JONES, Appellant, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY and GROVER A. WRIGHT.—108 S. W. (2d) 94.

Division One, July 30, 1937.

*R. H. Musser* and *Elliott & Crouse* for appellant.

*Luther Burns* and *Culver, Phillip, Kaufmann & Smith* for respondents.

FERGUSON, C.—On May 29, 1933, plaintiff's husband, John Jones, their daughter Mary Virginia, age thirteen years, and plaintiff were riding in an automobile driven by plaintiff's husband. The automobile was struck by one of defendant railway company's trains, operated by defendant Grover Wright, as motorman, on the crossing of a public road or highway and the railroad track at Settles Station in Platte County. Plaintiff's husband and daughter were killed and plaintiff sustained serious personal injuries. The petition is in three counts. The first count is for damages for the death of plaintiff's husband, the second, for the death of her minor daughter, and the third, for personal injuries sustained by plaintiff. Each count in identical language, charges the defendants with various acts of negligence including humanitarian negligence. The action was instituted in the Circuit Court of Clinton County where, upon a trial, the verdict of the jury, and judgment thereon, was for defendants; from which judgment plaintiff brings this appeal. The first and second counts each pray damages in the sum of $10,000 and the third count alleges damages in the amount of $30,000, hence our jurisdiction.

Plaintiff's instruction submitted negligence, under the humanitarian rule as the sole ground of recovery by plaintiff and liability of defendants. Her given instructions numbered 1, 2 and 3 apply to the first, second and the third counts of the petition respectively. Except as to the direction to find for plaintiff upon the count submitted by the particular instruction the instructions are identical in wording. The jury were told that if they found that defendant Wright. (the operator of the "gas electric motorcar" by which the train was drawn) "*saw, or in the exercise of ordinary care could have seen, . . .* the automobile in a place of imminent danger and peril approaching or on the railroad track . . . in time so that by the exercise of ordinary care and with safety to the train," etc., he "could have thereafter stopped said train before it struck the automobile" but "negligently failed" to do so, etc., the finding should be for plaintiff and against both defendants on the count submitted. (Italics ours.) Purportedly as the converse of these instructions defendants requested and the court gave their Instruction E, as follows: "The jury are instructed that if they believe from the evidence that the defendant Grover A. Wright, motorman on the train mentioned in evidence, *did not see the automobile* with which said train collided *or* in the exercise of ordinary care on his part could not have seen said auto-

mobile in or going into a place of danger of being struck, in time by the exercise of ordinary care on his part to have stopped said train and avoided striking said automobile, then your verdict will be for both defendants on all three counts of the petition.'' (Italics ours.) The giving of this instruction on the part of the defendants is the sole assignment of error made by appellant.

It will be noted that defendants' instruction directs a verdict in their favor on a finding alone that defendant Wright ''did not see the automobile . . . in or going into a place of danger of being struck in time,'' etc. It is inconsistent, and in conflict, with plaintiff's instructions requiring a verdict for her if, in connection with the other hypothesized facts, the jury found either: (1) that Wright saw the automobile in time, etc., or (2) that by the exercise of ordinary care he could have seen it, in time, etc. Defendants-respondents say: ''The instruction would have been erroneous if there had been any substantial evidence that the engineer could have seen the peril before he actually did see it. We would not contend otherwise.'' Continuing, respondents' brief, in defending the instruction, states: ''But in this case there is no credible evidence that the engineer could have seen the automobile in a position of peril before he actually did see it.'' Respondents use the term ''no credible evidence'' and the argument advanced seems to go more to the credibility of the evidence than to its substantiality. If, as is contended by respondents, the evidence, conclusively shows that the motorman actually saw the automobile at the earliest time, at which, by the exercise of ordinary care, under the circumstances, he *could have seen it,* in a place of imminent peril and danger, there would be no real issue of fact about the matter and the jury could not likely have been misled or confused by the wording of the instruction. This requires an examination of the evidence as viewed in a light most favorable to plaintiff.

At this crossing the public road runs east and west, the railroad track north and south. The automobile in which plaintiff, her husband and their thirteen year old daughter were riding was a coupe; a closed car with one seat. Plaintiff stated that it was an ''old second hand'' automobile when she and her husband purchased it and that they had owned it four or five years. Plaintiff's husband was driving; plaintiff was seated on the other side of the one seat and their daughter was sitting between them. The collision occurred ''about seven o'clock in the evening, May 29, 1933,'' but ''it was yet daylight.'' They were traveling east, returning from Platte City to their farm home about two miles east of the crossing. The train was traveling south. The train was composed of a ''gas-electric motorcar,'' operated by defendant Wright alone, and seven cars, six freight cars and ''a combination baggage car and coach'' at the rear. Two of the freight cars were loaded, the other four ''were empties.'' It was one of de-

fendant railway company's regular trains between Altamont, Missouri, and Leavenworth, Kansas. From a point on the road some 125 feet west of the railroad track there is a slight upgrade or incline to the track. Defendants' evidence shows there were clusters of "bushes" at intervals along the west side of the railroad track north of the crossing and some scattered trees and bushes along and near the north side of road west of the track so that the visibility of the road and vehicles upon it was obstructed and obscured at certain points along the railroad track, north of the crossing, and likewise the visibility of trains upon the railroad track was obscured at certain points along the road as it neared the crossing from the west. However defendants' witness, a civil engineer, testified that he made certain tests and measurements as to visibility along the road and railroad track. He stated that from a point in the highway 50 feet west of the crossing there was clear and unobstructed visibility along the railroad track for 297 feet north of the crossing; from 40 feet west of the crossing for 321 feet north; from 25 feet west of the crossing for 363 feet north; and from 15 feet west of the crossing for 472 feet north. Defendants' evidence was also that for about a one-fourth of a mile north of the crossing the view of the crossing, from the front of the train, was unobstructed. East of the railroad track and north of the public road "a half of a box car body" used as a "waiting room" was located, "the north side" of this "waiting room" is twenty-four feet north of the "center" of the road; north of the "waiting room" is a "box car body" referred to by defendants' witnesses as the "freight house," the "north end of it" being eighty-one and one-half feet north of the "center" of the road. The width of the road is not, as the writer recalls, given. The "stock pens" or "stock yards" are north of the crossing. The south side of the "stock pens" is 331 feet and the north side 450 feet, north of the crossing. The "stock chute" or "loading dock" at the "stock pens" is 373 feet north of the crossing.

Plaintiff gave the following account of the collision. As their automobile approached the point in the road where the slight upgrade to the railroad track commences it was traveling at a speed of twenty or twenty-five miles an hour but as it "went up the incline toward the railroad track it seemed to slow down." "We looked before we got up to the track to see if a train was coming,' but you couldn't see, for the brush and stuff along there, until you got right up to the track." "Just as we got on the track we looked and saw the train," "we said, 'there is the train'" and the automobile "stopped on the track." When they saw the train, just as the automobile got on the track, the front of the train, the motorcar, was then "just above" (north of) or "even with the stockyards;" "I tried to get out and tried to get Mary Virginia out. I think I got partly out. . . . The

door on the right side was hard to open.'' Plaintiff estimated that the train was traveling at a speed of ''between 30 and 40 miles an hour.'' The position of the motorman or operator of the motorcar, the defendant Wright, was at the right side in the front end of the car from which point he could keep a lookout along the track. According to plaintiff's version when the automobile got upon the track and stopped the front of the train was then ''just'' north of or ''even with the stockyards.'' We have noted the distances above, the north side of the stockyards is 450 feet north of the center of the crossing. If the language be construed as referring to the ''stock chute'' or ''loading dock'' at the ''stock pens,'' that is 373 feet north of the center of the crossing. If therefore the motorman had been keeping a proper lookout, as it was his duty to do in approaching a public road crossing, he *could have seen* the automobile go on the track, and stop on the track, while his motorcar was yet, at least 350 to 400 feet north of the crossing, allowing defendants the most favorable view of plaintiff's estimate as to distances. Further according to defendants' evidence, set out supra, for a distance of 472 feet north of the crossing there would be a clear and unobstructed view of the automobile after it came within fifteen feet of the track. So in view of plaintiff's testimony as to the whereabouts of the motorcar of the train at the time the automobile got on the track it follows as a reasonable inference that had the motorman been keeping a proper lookout he could, when his motorcar was yet 400 feet or more north of the crossing have seen the automobile as it passed the point in the road fifteen feet west of the crossing and that he could have seen it continuously thereafter as it went on the track while his motorcar was yet, according to the testimony of plaintiff's expert witness, which we shall presently mention, a sufficient distance north of the crossing in which to have stopped it before reaching the crossing and striking the automobile which had stopped thereon. Defendant Wright, called as a witness by plaintiff, testified that the train was running at a speed of about twenty miles an hour as it approached the crossing. No stop was to be made at the station. The undisputed evidence is that the brakes, sand, and all the braking equipment of the motorcar and train were in good working condition. Plaintiff had the testimony of an expert witness, of many years experience as a motorman in the operation of this type of motorcar on trains of this kind. He testified that this train, under the conditions there existing, traveling at a speed of twenty miles an hour could have been stopped, with safety to train and crew, in 125 to 130 feet, and traveling at forty miles an hour in 250 to 270 feet. But the motorman Wright took no action to stop the train until his motorcar ''had gotten down to the little box car, and the car they have for a passenger station'' when the air was applied and short blasts of the whistle were

sounded, according to the conductor who was defendants' witness. The distance of these box cars, used for station purposes, north of the center of the public road has been above noted. Referring thereto it will appear that the utmost distance north of the crossing that Wright first acted to avoid the collision would not be more than eighty feet. Defendant Wright, called as a witness by plaintiff, stated that his motorcar was not "over 60 to 80 feet" north of the crossing when he put the "brakes in emergency to stop it." The undisputed evidence is that the motorcar of the train ran 300 feet south of the crossing before it came to a stop. The working of the brakes of the train were not in any way affected by the collision.

It is to be inferred or assumed that a motorman would act promptly to avoid a collision upon *seeing* an automobile on or going upon the track in front of the train, and granting that defendant Wright did so act when, his motorcar being sixty or eighty feet north of the crossing, he actually *saw* the automobile going on the track, yet plaintiff's testimony, and the other evidence we have noted in connection therewith, is substantial evidence tending to show that, in the exercise of ordinary care in keeping a lookout, Wright *could have seen* the automobile on or going on the track when the train was yet 350 to 400 feet or more north of the crossing and continuously thereafter.

Defendants attack the credibility of plaintiff's testimony and would have us disregard it and accept the testimony of defendant Wright, which we shall presently review, as conclusive. They comment, that if the train was at the point north of the crossing when the automobile went onto the track and stopped, as related by plaintiff, that some ten to twelve seconds of time would have elapsed before the collision, affording ample time, as they argue, for those in the automobile to have escaped. Plaintiff said the door of the automobile was "hard to open," that she was trying to get out and trying to get her daughter out, that she thinks she (plaintiff) was partly out when the train struck the automobile. Plaintiff's testimony is not contrary to physical law or the physical facts and its credibility is for the jury.

We come now to the testimony of defendant Wright. As stated he was called as a witness by plaintiff and defendants seem to take the position that plaintiff is concluded by his testimony. On cross-examination he gave the following version of the collision: From a quarter of a mile north of the crossing he was continuously "looking ahead," "watching this crossing;" "I looked left first (to the east) because that box car (used as a station) kinda hides anybody, so I gave that side a quick look, and then I looked this way (to the west, from which direction the automobile was traveling) and as I did that I saw this car . . . within 20 or 25 feet of the track . . . coming up towards the railroad track. It didn't look like

it was going to stop. It appeared to me like we was both going to get to the crossing at the same time and I jerked my brakes in emergency to stop as quick as I could and kept blowing my emergency whistle," and that at the time he "first saw" the automobile and "put on the emergency brake . . . I was not over 60 to 80 feet at the most from the crossing." On direct examination Wright stated that at the speed the train was traveling, "I would say it would take around 260 to 300 feet from the time the brakes go on to make a stop." As stated the train ran 300 feet south of the crossing before coming to a stop.

■ Plaintiff was not bound by such part of the testimony of defendant Wright as was contrary to, and contradictory of, plaintiff's theory as pleaded in her petition and presented by her testimony and other evidence in the case favorable thereto. It is said, in Lolorado v. Lacy, 337 Mo. 1097, 88 S. W. (2d) 353, "In any case, where a party desires to prove an essential part of his case by his opponent, he is permitted to do so, and he is only bound by the part of his adversary's testimony which he himself offers and vouches for as the truth." "The fact that the motorman was plaintiff's witness does not make all that he testified to conclusive upon plaintiff. The facts may be shown to be otherwise by other evidence." [Smith v. Kansas City Public Service Co., 328 Mo. 979, 991, 43 S. W. (2d) 548, 553.] Therefore while the plaintiff called the motorman as a witness she was not thereby precluded from establishing her case by other testimony contradictory of that given by the motorman. [Maginnis v. Mo. Pac. Ry. Co., 268 Mo. 667, 675, 187 S. W. 1165, 1167; Hoelker v. American Press, 317 Mo. 64, 79, 296 S. W. 1008, 1013.] The following comment is from the Hoelker case, last cited: "Counsel for defendant argue that Nowak's testimony that he sounded the horn is conclusive upon the plaintiff. This is upon the ground that Nowak was plaintiff's witness, and also that there was no other testimony upon that point entitled to be considered. While plaintiff could not, and did not, attempt to impeach Nowak by showing that he had made contradictory statements elsewhere upon that point, the plaintiff was not precluded from showing, if he could, either by himself or by another witness, that the horn was not sounded." While "a party may not *directly* impeach his own witness . . . it does not follow that he cannot introduce other evidence, if of independent probative force, even though it be contradictory of what the witness said." [Smith v. Ohio Millers Mut. Fire Ins. Co., 320 Mo. 146, 6 S. W. (2d) 920; Black v. Epstein, 221 Mo. 286, 304, 120 S. W. 754, 760.] ■ The testimony of the motorman was for the jury. They could believe all or none of it, or accept it in part or reject it in part, as they found it to be true or not considered in relation to the other testimony and the facts and cir-

cumstances in the case. [Gould v. Chicago, B. & Q. Railroad Co., 315 Mo. 713, 723, 290 S. W. 135, 138.] So the other testimony in this case considered a jury could have believed, that the motorcar of the train was within sixty to eighty feet of the crossing when the motorman first actually saw the automobile, as he stated and as indicated by other evidence in the case that at about that point he first acted to avoid the collision, but have disbelieved his statement that the automobile was at that time twenty or twenty-five feet west of the track and have believed instead plaintiff's version that, at that time, the automobile was stopped on the track, and that at the time it went on the track and stopped the train was then "just above" or "even with the stockyards." So finding it would follow, as we have heretofore pointed out, that the motorman in the exercise of proper care in keeping a lookout *could have seen* the automobile in a position of peril when the motorcar of the train was yet at a sufficient distance from the point where he actually did see it that he could, according to plaintiff's evidence, have stopped the train before it reached the crossing.

The review of the evidence we have made demonstrates, we think, that there is substantial evidence tending to show that the motorman could have timely seen the peril before he actually did see it. Therefore the giving of defendants' Instruction E necessarily constituted prejudicial error against plaintiff which requires that the judgment of the circuit court be reversed and the cause remanded. It is so ordered. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by Ferguson, C., is adopted as the opinion of the court. All the judges concur.