DIANNE SUE DeLAY, by JAMES DeLAY and MARJORIE DeLAY, Her Next Friends, Respondents, v. JASE M. WARD, Appellant, No. 43903—262 S. W. (2d) 628.

Court en Banc, November 9, 1953.

Rehearing Denied, December 14, 1953.

432

*Ward & Reeves* for appellant.

*Limbaugh & Limbaugh* for respondents.

DALTON, J.—This is an action for damages for personal injuries sustained by plaintiff, a three year old child, when she was struck and injured by an automobile operated by defendant. The cause was submitted solely upon humanitarian negligence in failing to slacken speed, swerve or warn. Verdict and judgment were for plaintiff for $2000.

Defendant took an appeal to the Springfield Court of Appeals and that court ordered the judgment reversed and judgment entered for defendant on the ground that the trial court should have directed a verdict for defendant, as requested. The court said: "There is not the slightest evidence in the case that defendant ever *saw* plaintiff until he saw her knocked down and injured by coming in contact with his automobile. * * * There is not the slightest evidence in this case that defendant ever *knew* that plaintiff was at the side of the highway chucking rocks or other substances into the sewer outlet, until he saw her 'dart' in front of his car. It was then too late for defendant to slow down or to stop his automobile or even to warn plaintiff of her deadly peril." (Italics ours). DeLay v. Ward (Mo. App.), 262 S. W. (2d) 626. The cause has been transferred to this court and we shall review the record as on original appeal. Art. V, Sec. 10, Const. of Missouri 1945.

Error is assigned solely on the trial court's action in overruling defendant's motion for a directed verdict based upon the ground that "the evidence wholly fails to substantiate any charge of negligence alleged in the plaintiff's petition" and under "the law and the evidence, the plaintiff is not entitled to recover." If plaintiff made a submissible case for the jury on any of the assignments of negligence pleaded and submitted to the jury, the court did not err in overruling the motion for a directed verdict. Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S. W. (2d) 91, 94. We have reached the conclusion that viewing the evidence in a light most favorable to plaintiff, the jury could properly find that, in the exercise of the highest degree of care, the defendant could have seen the plaintiff crossing the highway ahead of him and in imminent peril of being struck by his automobile in time, thereafter, with the means at hand and with safety to himself and others, to have slackened the speed of his automobile and avoided injuring the plaintiff. We find it unnecessary to consider the other assignments of negligence submitted.

At the time plaintiff was injured she was crossing Main Street in Bell City, Missouri. Main Street extends from the southwest to the northeast. It is a "black top", hard surfaced highway. It is also State Highway No. 91 and the principal highway extending through the city. Defendant was a resident of Bell City and familiar with the highway and with its intersection with Section Line Road extend-

ing north and south and intersecting the highway a short distance south of DeLay's garage, a building located on the northwest side of Main Street. The width of the traveled portion of the highway and the width of its shoulders or right of way does not appear from the record, but it is apparent from the testimony that it was a two-lane hard surfaced state road. From the testimony, a jury could infer and find that the traveled portion of the road was approximately 18 feet in width.

About 3:20 p.m., November 30, 1951, defendant was traveling northeastwardly on his right hand side of the highway and the plaintiff was crossing from the northwest ▮▮▮▮ to the southeast side of the highway. She was struck and injured when she was within about two feet of the southeast edge of the traveled portion of the highway. The right side of the front bumper struck the child and the right rear wheel appears to have passed over her. In view of the conflicts in the evidence, we shall review the testimony of some of the witnesses.

Defendant, called as a witness by plaintiff, testified that, as he approached Bell City driving his 1949 Mercury automobile, he slowed down west of the Cotton Belt railroad tracks and passed around another automobile that had stopped there; and that he then proceeded into Bell City. When defendant entered Main Street and turned northeast, he could see DeLay's garage on his left about 150 yards up the highway. He saw that the highway in front of DeLay's garage was completely blocked by a self-propelled combine located on the highway. He didn't "know what position it was in," but it was on the highway and "they" were working on it and he saw and knew the operator. He "could absolutely not go around it"; but, as he approached the combine, it began moving off the highway. He could see DeLay's garage and could see on the left side of the combine and he looked in there but didn't see anyone. It does not appear how far DeLay's garage building was located from the edge of the traveled portion of the highway. Defendant testified he "wouldn't say" there was as much as 15 or 20 feet "between the garage and the beginning of the highway," but there were "a few feet in there." Other witnesses said there was room for the combine between the garage and the road.

Defendant didn't know exactly how fast he was driving when he first saw the combine and at that time he did not immediately slow down, but as he approached and got closer he began to slow down. Defendant further testified: "As I got up closer to the combine, as I approached it, I wasn't driving fast. We have a short curve coming across the railroad there * * * and a fellow couldn't make the curve much over 20 miles. * * * All right, as I got up closer and closer, I kept slowing down, driving along slow, you know, and I expect I got down to 10 mile, waiting for the combine to give me room to go on up through Bell City. I had to wait to get them to give me my right side of the road." Defendant did not stop, but he "had to slow

down for it to get out'' of his way. The combine was backing off the highway at an angle, not directly towards the garage, but ''almost west.'' He could see it was moving backwards. He was watching the combine, ''until there was enough room to get by.'' Defendant testified: ''Whenever they give me my half of the road I went by the combine. * * * It was still in the other lane, * * * when that combine give me my half of that right-of-way there on 91 Highway, I was right up pretty close to the combine. * * * As soon as I had room to go through, I went on through. * * * I don't think I was driving over 15 mile but I would say 20 to be sure, to catch the speed I was driving. * * * When I first seen the little girl she was crossing the highway in front of my car. * * * Q. She was going south across the highway? A. Yes. Q. Was she going straight across? A. I couldn't tell you. This was quick, and it takes a little time for the mind to concentrate there, and she was just a few feet in front of my car when she started across the road, and, absolutely, I couldn't keep from hitting her. * * * I don't know whether I got on the brake before I hit the little girl—it was all about the same time. * * * I was over on my side of the road, to the right. I had to be there to get around this combine—if I ever swerved to the left—I wasn't going to run into the combine. * * * I rather think it (the automobile) hit her a little bit on the right side, from the middle, just a little from the middle. * * * She was approximately 2½ to 3 feet over on the black top, from the right side of the road. * * * Q. How long did it take you to stop, Mr. Ward? A. Just a very few feet, Mr. Limbaugh.''

On cross-examination by his *own counsel* defendant stated: ''Q. Now, at the time you approached that place * * * did you know at that time this child was behind the combine? A. I did not. Q. If the child had been in the open there, in front of the garage would you have seen her? A. Yes, sir. Q. But you did not see the child until she darted from behind the combine? A. No, sir, I did not. Q. At that instant you tried to get on your brakes, and did get them on? A. Yes, sir. Q. Did you do everything you knew to do to avoid the accident? A. Absolutely, I did.''

Plaintiff's witness McKee testified that at the time in question he was working at DeLay's garage, working on a combine, testing the rear wheels. He was standing on the ground behind the combine watching the wheels and had been working on them. Three or four persons were behind the combine with him. No one was in front of it. The operator of the combine had ''pulled out towards the road and was backing up when the accident happened.'' The combine ''went out about a foot'' on the highway and was then ''backed up'' towards the garage. The engine was running and making a ''right smart noise.'' Plaintiff ''was poking some rocks down a hole, into the sewer, in front of the garage.'' The sewer was northeast of the combine ''somewheres

around ten feet." "Mr. Ward was coming up the road and just as Dianne started across the road I saw Mr. Ward come behind the combine, and we heard the lick." Witness did not see her when she was struck by the car, but only when the right rear wheel ran over her. She was released about 40 feet (by measurement) from the point where she was struck. "It was 40 feet from where she lay to where the car stopped." He estimated the speed of the car at 25 to 30 m.p.h. The combine had been out about 6 feet on the highway before defendant arrived, but it was out only about a foot when defendant passed it in his automobile. The automobile stopped "about the center of the road." If defendant attempted to swerve, he didn't see him, but he did see defendant in the car and defendant was at all times on his own side of the road. Witness estimated the width of the combine at 10 feet. The combine was between the garage and the road and it was between the sewer inlet, where "the little girl was standing * * * poking rocks into the sewer," and the position defendant was in on the highway. Witness did not see defendant until "just as he started to go by the combine." He (witness) was then about 25 feet from defendant. At that time the child was "at the hole." Defendant "was southwest of the combine when the little girl jumped up and ran around to the other side." Witness "saw her run around there." She was "out to one side, and she ran across." "Just before" defendant's car "got to the combine, the little girl jumped up and ran across the street." "Just about the time Mr. Ward went by the combine was when she ran across the road." Defendant "was about 20 feet from her," when she came into his (defendant's) view. Witness saw the child start from his own immediate left and he didn't have time to holler at her or do anything. The child had been playing to witness' left and, although he saw her start to run across, the combine was between him and her, when the car struck her. At that time he couldn't see anything but the car, and he didn't see her again, "until she fell off and he (defendant) run over her."

Other witnesses fixed the speed of defendant's car, down about the curve, at "approximately 30 miles per hour." There was evidence that the plaintiff "had been chunking rocks in the sewer"; that "the combine was between the sewer inlet and the car approaching from the south on the highway"; that the child "lacked a couple of feet, maybe, of being across the highway" when she was hit; and that, after the front bumper struck her, "the car kept going" and did not stop "until 40 feet, and after it run over her * * * it went 40 feet," "or 80 feet from where plaintiff was struck. One witness said the plaintiff "walked around in front of the combine" and he missed her and heard the car hit her. Other witnesses saw the right rear wheel run over the child or saw her "come rolling out from under the car."

Defendant's evidence tended to show that defendant was driving about 15 m.p.h. when he drove around the Williamson car near the railroad crossing. There was also evidence that he passed around the curve and headed northeast up Main Street at 15 to 20 miles per hour before striking the child. Another witness fixed his speed at 15 miles per hour after he got around the curve and headed northeast.

Plaintiff sustained a severe cerebral concussion and bruises and lacerations over her body, but no fractured bones. The extent of her injuries are not material to the issues now presented.

Appellant contends that, "since there was no proof of reaction time on the part of the defendant after he saw the perilous position of the plaintiff, the court will take judicial notice that such reaction time was three-quarters of a second"; and that "the minimum speed of the automobile under the evidence was 15 m.p.h., and the maximum distance of the automobile from plaintiff when her perilous position was or could have been discovered was 20 feet between the automobile and the plaintiff." Appellant further says that "there was no evidence, expert or otherwise, as to the distances it would have taken the defendant to have stopped his automobile at the various rates of speed shown by the different witnesses." Appellant insists that "in this situation it is pure conjecture * * * to assume that the defendant could have done something to have avoided the accident"; and that, as a matter of law, a submissible case of humanitarian negligence was not made out. Appellant relies particularly on Vietmeier v. Voss (Mo. Sup.), 246 S.W. (2d) 785; Young v. St. Louis Public Service Co. (Mo. Sup.), 250 S.W. (2d) 689; Taylor v. M.K.&T. R. Co., 357 Mo. 1086, 212 S.W. (2d) 412, and other cases.

In determining whether plaintiff made a case for the jury, we must consider all of the evidence in a light most favorable to plaintiff. Smithers v. Barker, 341 Mo. 1017, 111 S.W. (2d) 47, 50; Skidmore v. Haggard, 341 Mo. 837, 110 S.W. (2d) 726. We must take plaintiff's evidence as true, where it is not entirely unreasonable or opposed to physical laws, and give her the benefit of all favorable inferences arising from all the evidence and reject unfavorable inferences. The cause may not be withdrawn from the jury unless the facts in evidence and the legitimate reasonable inferences which may be drawn therefrom are so strongly against plaintiff as to leave no room for reasonable minds to differ. Barrett v. St. Louis Southwestern R. Co., (Mo. Sup.), 143 S.W. (2d) 60, 62; O'Shea v. Pattison-McGrath Dental Supplies, 352 Mo. 855, 180 S.W. (2d) 19, 21; Holmes v. McNeil, 356 Mo. 763, 203 S.W. (2d) 665, 668.

The fact that plaintiff called defendant as a witness on behalf of plaintiff did not make all that defendant testified to conclusive on plaintiff. Plaintiff was not precluded from establishing her case by other testimony, even though it contradicted defendant's testimony. A party is only bound by the uncontradicted testimony of his ad-

versary which he introduces. Klotsch v. P. F. Collier & Son Corp., 349 Mo. 40, 159 S.W. (2d) 589, 594; Orlann v. Laederich, 338 Mo. 783, 92 S.W. (2d) 190, 193; Jones v. Chicago, R. I. & P. R. Co., 341 Mo. 640, 108 S.W. (2d) 94, 97. Accordingly, plaintiff was not bound by such parts of the testimony of defendant as were contrary to, and contradictory of plaintiff's theory of negligence as pleaded in her petition and submitted by her instructions and sustained by other testimony and evidence on her behalf. Defendant's testimony was for the jury. They could believe all or none of it, or accept it in part or reject it in part, as they found it to be true or not in relation to the other testimony and the facts and circumstances in the case. Jones v. C.R.I.&P.R. Co., supra. Further, plaintiff was not conclusively bound by the unfavorable testimony of any of her witnesses where the testimony was contradicted either expressly or by inference, by other evidence or circumstances, as where the circumstances or the evidence of other witnesses in her behalf would warrant the triers of fact in disregarding the adverse testimony or in drawing a contrary inference. Holmes v. McNeil, 356 Mo. 846, 204 S.W. (2d) 303, 306; Summa v. Morgan Real Estate Co., 350 Mo. 205, 165 S.W. (2d) 390, 394; Barnum v. Hutchens Metal Products, Inc. (Mo. Sup.), 255 S.W. (2d) 807, 808.

 Considering the evidence in a light most favorable to plaintiff, as we must, the jury could believe and find from defendant's own testimony that at the time he started to pass the combine his speed was approximately 10 miles per hour. His testimony that he stopped his automobile in "just a very few feet" tends to confirm a low rate of speed. Respondent suggests that the evidence shows a minimum speed of 15 m.p.h., but we do not agree.

 Since defendant was able to stop his automobile in "just a very few feet" after he first saw plaintiff, the jury could infer and find that the condition of his automobile and its brakes were such that at the rate of speed mentioned, he could stop in "just a very few feet." Beier v. St. Louis Transit Co., 197 Mo. 215, 231, 94 S.W. 876; Smith v. Thompson, 346 Mo. 502, 142 S.W. (2d) 70, 74; Robinson v. O'-Shanzky (Mo. App.), 96 S.W. (2d) 895, 899. The jury could disbelieve defendant's testimony that plaintiff was just a few feet in front of his car when she "started across the road." Instead, the jury could believe the testimony of Mr. McKee that, "just before" defendant's automobile "got to the combine, the little girl jumped up and ran across the street," or they could believe McKee's testimony that plaintiff was about 20 feet from defendant when she came into defendant's view, or they could find from the evidence that the combine was "about one foot" on the highway, when defendant passed it; and that before he passed it he could have seen plaintiff from the time she started across the highway, since she started from a point 10 feet beyond the combine and defendant was approaching from the south-

west on the opposite side of the highway. Of course the witness' estimate of distance was not conclusive if there were other facts and circumstances to show the estimate was incorrect. There are some other facts and circumstances in evidence from which the jury might believe and find that defendant was in fact more than 20 feet from plaintiff when plaintiff started across the highway. There was testimony from which the jury could find that the combine was backed at an angle to the west; and that McKee was behind and west of the combine. If, as he testified, he was 25 feet from defendant, when defendant started to pass the combine, the jury could infer and find that defendant was more than 20 feet from the plaintiff, when plaintiff started across the highway.

The question here is, not whether defendant did see the plaintiff when she started across the road, but whether in the exercise of the highest degree of care the defendant could and should have seen her in a position of imminent peril in time to have avoided striking her by slackening the speed of his automobile. "In other words, in spite of a failure to keep a lookout, the humanitarian doctrine may come into operation, not because that is in itself humanitarian negligence, but because we have, *at places where there is a duty to keep a lookout,* extended the humanitarian rule to discoverable as well as discovered peril." Mayfield v. Kansas City So. R. Co., 337 Mo. 79, 85 S.W. (2d) 116, 123; Murphy v. St. Louis Public Service Co., 362 Mo. 772, 244 S.W. (2d) 31, 34; Pitcher v. Schoch, 345 Mo. 1184, 139 S.W. (2d) 463, 467. Under the discoverable peril theory a defendant is charged with seeing what he could have seen whether he looked or negligently failed to look.

In this case we think that the evidence was such that the jury could find that plaintiff was at all times open to defendant's view from the time she started across the traveled portion of the highway until she was struck, when she only "lacked a couple of feet, maybe," of being across. A passenger in an automobile following defendant saw "the girl run out and get hit," but did not see the combine until the automobile in which she was riding stopped behind defendant's automobile after plaintiff was injured. From defendant's own testimony the jury could infer that defendant did in fact see her from the time she started across, but the jury could disregard that part of defendant's testimony about her being "just a few feet in front" of his automobile "when she started across the road." Instead, the jury could believe the evidence more favorable to plaintiff on this issue. Clearly, the jury could find that plaintiff was in imminent peril of the automobile from the time she started across the highway; that she was oblivious of her peril; and that such imminent peril was or should have been apparent to defendant in the exercise of the highest degree of care, if he could have seen her.

442

■ There is no direct testimony that plaintiff ran straight across the road, but no one said she did not, and the jury could infer and find from the testimony that she did run directly across. There was no testimony as to how fast a three year old girl could run or as to how fast the plaintiff ran, or whether she ran fast or slow. However, the speed at which a three year old child could run across a hard surfaced highway is a matter of common knowledge not requiring expert testimony. This court has taken judicial notice of the fact that the ordinary walking speed of the average man is two or three miles per hour or 2.9 to 4.4 feet per second. McGowan v. Wells, 324 Mo. 652, 24 S.W. (2d) 633, 639; Zickefoose v. Thompson, 347 Mo. 579, 148 S.W. (2d) 784, 792; Rosenberg v. Terminal R. Ass'n. of St. Louis (Mo. Sup.), 159 S.W. (2d) 633, 635; Dister v. Ludwig, 362 Mo. 162, 240 S.W. (2d) 694, 698; Wofford v. St. Louis Public Service Co. (Mo. Sup.), 252 S.W. (2d) 529, 531; Romandel v. Kansas City Public Service Co. (Mo. Sup.), 254 S.W. (2d) 585, 590. A three year old child (the age admitted by the pleadings) would run little faster than a man would travel at a brisk walk and not exceeding six miles per hour. Respondent says the jury could infer 10 miles per hour, but we do not agree. From the evidence before it, the jury could find that plaintiff ran at the rate of 4 to 6 miles per hour. At 4 miles per hour, the child would travel at the rate of 5.866 feet per second and at 6 miles per hour at the rate of 8.8 feet per second. At the rate of 5.866 feet per second it would have taken the plaintiff 2.72 seconds to cover 16 feet and reach the point of collision. At the rate of 8.8 feet per second it would have taken 1.8 seconds.

■ If defendant was traveling at 10 miles per hour, he was moving at the rate of 14.66 feet per second. At this rate of speed, with defendant at a minimum of 20 feet away when plaintiff started across, the defendant without slackening speed would have arrived at the point of collision within 1.3 seconds. Defendant and plaintiff arrived at the point of collision at the same time, but the jury could have found from other evidence that defendant was more than 20 feet away, if he did not decrease his speed before the collision.

As stated, there is no evidence of reaction time, except as testified to by defendant, to wit, that "it takes a little while for the mind to concentrate." If we give appellant the benefit of his contention that reaction time should be taken to be ¾ of a second [see Vietmeier v. Voss, supra, 246 S.W. (2d) 785, 788 (5)], the defendant would have traveled 10.99 feet before he could have reacted to the situation before him and applied the brakes, but he still had 9 feet or more, thereafter, within which to stop, or sufficiently slacken speed. While we do not judicially know the exact stopping ■ distance of an automobile traveling at 10 m.p.h. after the brakes have been applied, we do know that, exclusive of reaction time, an automobile with good brakes, traveling at 10 m.p.h. can be stopped within 9 feet and the

jury could so find. Dister v. Ludwig, supra, 240 S.W. (2d) 694, 698; Hutchison v. Thompson (Mo. Sup.), 175 S.W. (2d) 903, 909; Spoeneman v. Uhri, 332 Mo. 821, 60 S.W. (2d) 9, 12; Davis, Agt. v. Schroeder, Circuit Court of Appeals (8th Cir.), 291 F. 47, 51.

In this case it is not a matter of stopping, as no such case was submitted, but it is rather a matter of slackening the speed of the automobile a sufficient amount to permit plaintiff to escape injury. Such a case has been referred to as an almost escaping case. At a speed of 4 to 6 miles per hour, the plaintiff would have completed a crossing of the traveled part of the street and cleared the path of the automobile in another 2 feet, or in less than ⅓ of a second of additional time. In view of the evidence in the case the jury could find that after the claimed reaction time had fully elapsed, the defendant by an application of the brakes could have slowed the automobile sufficiently to permit plaintiff to escape in safety. Pitcher v. Schoch, supra, 139 S.W. (2d) 463, 467 (7-10); Stith v. St. Louis Public Service Co. (Mo. Sup.), 251 S.W. (2d) 693, 698; Stokes v. Wabash R. Co., 355 Mo. 602, 197 S.W. (2d) 304, 307; Marczuk v. St. Louis Public Service Co., 355 Mo. 536, 196 S.W. (2d) 1000, 1003; Spoeneman v. Uhri, supra, 60 S.W. (2d) 9, 12; Smith v. Thompson, supra, 142 S.W. (2d) 70, 74; Diel v. St. Louis Public Service Co., 238 Mo. App. 1046, 192 S.W. (2d) 608, 611; Wood v. Kurn (Mo. App.), 183 S.W. (2d) 852, 856. And see Hunt v. Chicago, M. St. P. R. Co., 359 Mo. 1089, 225 S.W. (2d) 738, 740, distinguishing cases. We hold that plaintiff made a case for the jury on the issue of defendant's failure to slacken the speed of the automobile and the trial court did not err in refusing to direct a verdict for defendant.

The judgment is affirmed. All concur.