Isabel CARLSON, Appellant,

v.

ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Respondent.

No. 48685.

Supreme Court of Missouri,

Division No. 2.

June 11, 1962.

Motion for Rehearing or for Transfer to Court En Banc Denied July 16, 1962.

William R. Kirby, Charles A. Lee, Jr., St. Louis, for appellant.

V. James Ruddy, St. Louis, for respondent.

EAGER, Presiding Judge.

Plaintiff filed suit for personal injuries and property damage ensuing when her car, a 1948 Ford, was struck by a bus in St. Louis on July 3, 1958. The prayer was for $20,-200; the jury's verdict was for the defendant on plaintiff's claim and against defendant on its counterclaim for a rather trivial damage to the bus. The collision occurred near the south edge of Natural Bridge Road about 240 feet east of Kingshighway. Plaintiff, accompanied by a passenger who lived and worked with her, had proceeded west on Natural Bridge up to the point of collision. At that point the south or eastbound half of Natural Bridge was shown to be 39 feet, 2 inches wide from center to curb. Two eastbound traffic lanes were marked out immediately south of the center, leaving a space farther south which was shown to be 17 feet, 11 inches wide. The inner portion of this was used as a third traffic lane, the remainder for parking and bus zones. For clarity we shall refer to the latter as the parking lane.

Plaintiff wished to turn south, across the eastbound lanes, to enter a driveway which led to her employer's parking lot. From her testimony the following appears: she stopped in the westbound lane nearest the center of the street, turned on her blinker lights, held out her hand for a left turn and waited for the eastbound traffic to stop for the Kingshighway light; when it did, traffic in the first two lanes was backed up westwardly, but two cars in the first eastbound lane made room for her and she crossed it; cars in the next lane likewise made room and she crossed that and stopped, with her bumper even with the right side of the eastbound car in that second lane. No cars were stopped in the third lane. There she looked to the west and could see perhaps two car lengths or about 30 feet; she then moved slightly forward in order to see farther down the street to her right; she could and did then see for five or six car lengths, 75 to 90 feet, and saw nothing in the remaining lanes; she then proceeded on across, looking to see if there was anyone on the sidewalk and, attaining a speed of about five miles an hour, reached the driveway and entered it. When her bumper was about at the curbline, she heard something, looked, and saw an eastbound bus six or seven feet away traveling in the curb lane. Her car was struck on the right rear corner by the bus when the car was all in the driveway "up to the back wheel." The impact left the car at a 45 degree angle; the damage to the car was to the rear fender, largely behind the wheel, with also a crack in the right front door glass. The bus operator testified that the impact involved approximately the rear three feet of the right side of the car. The bus stopped near the curb and a short distance beyond the point of impact. Defendant's counsel offered portions of plaintiff's deposition to show that when she stopped after crossing the second lane she could see west to the next corner, but those inconsistencies were matters for the jury. At the trial she specifically denied this.

Plaintiff's passenger, Elizabeth Menzel, corroborated plaintiff's testimony in considerable detail, stating that after plaintiff crossed the second lane and stopped, she moved forward a little so that she could see, and "seeing nothing she started forward

\* \* \*." Miss Menzel first saw the bus when it was six or seven feet away, and traveling in the curb lane. This witness testified that she saw nothing coming when plaintiff stopped at the south edge of the second lane; that when plaintiff started out into the (third) lane the witness could see about five or six car lengths, and after her body passed the stopped cars she could see "quite a distance," and that there was nothing in view. She saw no parked cars.

A passenger on the bus, Clarence Woods, testified that he was standing at a door waiting to get off at the next stop; that the bus was traveling "in the bus stop zone" and right next to the curb; that at the time of impact the bus was so close to the curb that one would not have had to step in the street to reach the curb. He further testified that the bus was "pulling down" prior to the impact but no more than for a normal stop; that he was not holding on to anything and was not jarred off his feet, and in substance, that the stop was a normal one; that the bus did not swerve.

John William Bland, a registered engineer, testified to the street measurements, certain bus measurements, the average overall height of cars in 1958 (58 inches), the fact that a 1948 Ford would be somewhat higher, and that in a bus of this type the driver's eyes would be approximately six feet, eight inches above the pavement. He further testified: that at a speed of 20 to 22 miles an hour the bus could have reasonably been stopped in an overall distance of 72 feet with safety to its passengers, of which distance 25 feet would be consumed by reaction time; that at 20 miles an hour the bus would travel 30 feet per second and at 22, 33½ feet; that plaintiff's car would have traveled the distance from the south line of the second lane to the curb, being something over 17 feet, in a little more than three seconds, at the speed plaintiff described (i. e., from zero to five miles an hour).

The bus operator, James Counts, was put on the stand by plaintiff. He testified: that he was driving in the *third* eastbound lane; that the traffic on his left was stopped and cars were parked intermittently in the curb lane; that he first saw the top of plaintiff's Ford moving through the second lane of traffic at about five miles an hour, when he was about 35 feet from the Ford, and traveling at 20–22 miles an hour; that the Ford was then about half way through the second lane; that he had not previously noticed any open spaces in the traffic stopped on his left; that at 100 feet back he had been looking foward; that he was going to stop at the bus stop just 50–60 feet beyond the point of collision and that passengers were waiting to get off there; that after he first saw plaintiff's car it speeded up, and he immediately applied his brakes as hard as he could with safety, having his foot already on the brake; that he also swerved about two feet to his left coming to within six inches of the line of stopped cars; that the bus damaged the rear three feet of plaintiff's car and if it had been three feet farther south there would have been no collision; that he had a full load of passengers and stopped seven feet beyond the point of collision; that plaintiff's car came to rest about twenty feet into the parking lot; that the point of impact was 12–13 feet north of the curb, and that the front of the Ford was then at the curbline. The brakes of the bus were in good condition. It is not necessary to refer to any testimony concerning injuries.

Plaintiff's case was submitted on primary negligence in failing to keep a lookout, and on humanitarian negligence in failing to stop or slacken speed and thus avoid the collision. Defendant insists here that plaintiff made no submissible humanitarian case and that she was contributorily negligent as a matter of law; hence this detailed discussion of the evidence. Plaintiff complains of errors in two instructions, Numbers 6 and 2, and of error in the admission of evidence. In overruling plaintiff's motion for a new trial the court indicated: that it was denying the motion because plaintiff "failed to make a case," and that if defendant had filed an after-trial

motion for judgment it would have been sustained, with the condition that if the ruling should be reversed, plaintiff's motion for a new trial would be sustained for error in giving Instruction No. 6 in that it directed a verdict on "failure to stop only."

■ Defendant initially urges that appellant's statement, as well as her points and authorities, constitutes a violation of our Rule 83.05, V.A.M.R. We do not find them so deficient as to require a dismissal, or that we should disregard her points, but we do call the attention of the Bar, again, to what we said in Domijan v. Harp, Mo., 340 S.W.2d 728, 731–732, hoping that the Bar would take heed. The complaint that the questioned instructions are set out in appellant's statement, rather than in the argument, is not fatal; portions are also set out in the argument.

■ First,—did plaintiff make out a submissible humanitarian case? Defendant says that she did not, because she must have had substantial evidence showing the ability to stop as well as to slacken, that plaintiff was bound by the testimony of the operator, and that no witness fixed the location and speed of the bus at a time and place when the operator would have had the ability to stop after plaintiff came into peril. Defendant adds, also, that the operator testified to an immediate slackening of the bus, and that plaintiff is bound thereby. In considering whether plaintiff made out a submissible case, we consider the evidence in the light most favorable to plaintiff, though defendant had a verdict. Counts v. Kansas City Southern Ry., Mo., 340 S.W.2d 670, 672; Floyd v. St. Louis Public Service Co., Mo., 280 S.W.2d 74. Plaintiff's Instruction No. 4, the humanitarian submission, included the following: "* * * to have, by the exercise of the highest degree of care, avoided the collision mentioned in the evidence, by having stopped said bus or by having sufficiently slackened the speed thereof and that defendant's operator failed to do either and was thereby

negligent, * * *." Defendant insists that since this submission was in the disjunctive it was necessary that plaintiff have substantial evidence to support each such assignment of negligence (citing Gaffner v. Alexander, Mo., 331 S.W.2d 622; Lyons v. Taylor, Mo.App., 333 S.W. 2d 346) in order to make a submissible humanitarian case. That is a rule of wide and accepted application but it is ordinarily applied where objections to a specific instruction, preserved by the losing party, are being directly considered on appeal. Gaffner, supra; Lyons, supra; Setser v. St. Louis Public Service Co., Mo. App., 209 S.W.2d 746; Johnson v. St. Louis Public Service Co., Mo., 237 S.W.2d 136. Under those circumstances, if the instruction is unsupported by substantial evidence on one or more of the stated grounds of negligence, it is ruled to be erroneous. Here defendant had a verdict; it has lost nothing by reason of this plaintiff's instruction, and the correctness of the instruction, as such, is not in question on this appeal. Defendant's claim here is that the court should have directed a verdict for it at the close of the evidence. It was not entitled to a directed verdict if plaintiff had made a submissible case upon any theory. See, specifically, Lilly v. Boswell, 362 Mo. 444, 242 S.W.2d 73, 77. We rule that under these circumstances it is not necessary to find substantial evidence of the ability of the operator to *stop*, if there was substantial evidence of his ability to avoid the collision and injury "by having sufficiently slackened the speed. * * *." Consequently, we consider the latter phase of the evidence.

■ The operator testified that he was "about thirty-five feet" from plaintiff's car when he saw it, traveling at five miles an hour and about half way through the second lane. This does not, by any means, foreclose the duty to have seen it sooner. His statement of distance was at most an estimate, and indeed one which smacks of a conflict with the physical facts. This for the reason that he, at 20–22 miles an hour, was traveling from 30 to 33½ feet a second,

and plaintiff at approximately 7½ feet a second; he would surely have reached her car (upon his own theory that the collision was in the third lane) in not more than two seconds, even allowing for some slowing, whereas it would obviously have taken plaintiff approximately four seconds to finish the second lane, drive through the third, and go far enough through the curb lane and driveway to leave only three feet of her car in the path of the bus. In other words, it would seem physically impossible for the collision to have taken place as it did (i. e., with the bus striking the rear three feet of plaintiff's car) if the speeds and locations which he gave were true. We do not disregard his testimony, but the jury might fairly have inferred that the bus was considerably farther than 35 feet away when the operator saw plaintiff's car, and certainly still farther away when he should have seen it. Moreover, on the specific testimony of plaintiff, and her witnesses Menzel and Woods, that the impact occurred almost at the curb and in the curb lane, plaintiff would have been required to clear the full width of the curb lane except for three feet, thus necessarily placing the bus still farther back. There was direct testimony that it took plaintiff over three seconds to travel the 17 feet plus (actually 17 feet, 11 inches) from the south edge of the second lane *to* the curb. On her testimony she went approximately twelve feet farther before the collision, which means, of course, that her car was in the open and visible for more than four seconds. Of course, plaintiff was not in imminent peril until she emerged `from the stopped traffic and into the open lane or lanes. On the operator's evidence she would have come into imminent peril as soon as she entered the third lane, for he was traveling in it; in view of the fact that she was proceeding across the last two lanes, according to the favorable testimony, wholly unaware of the bus and evidently oblivious, we are convinced that there was substantial evidence to show that the bus was far enough away when the operator *should* have seen her car and recognized

her peril for him to have slackened sufficiently to avoid the collision. The evidence indicates that there was nothing to prevent him from seeing the car at any and all times after it started through the second lane of traffic, and from much farther back than 35 feet. Mr. Woods, the passenger, testified that the stop was nothing more than a normal stop, and that he was standing up, not holding on to anything. Defendant's counsel say on the slackening question that plaintiff is bound by the testimony of the operator that when he saw plaintiff's car at 35 feet, he immediately applied the brakes and stopped as soon as he could with safety. Plaintiff is not bound by the testimony of any of her witnesses where there is other evidence, express or by inference, on the subject (Burris v. Kansas City Public Service Co., Mo.App., 226 S.W.2d 743; DeLay v. Ward, 364 Mo. 431, 262 S.W.2d 628; Dodd v. Missouri-Kansas-Texas R. Co., 353 Mo. 799, 184 S.W.2d 454; Lay v. McGrane, Mo., 331 S.W.2d 592), and even where there is no other evidence or where the plaintiff so testifies himself, he is not conclusively bound by mere estimates of distance or speed. Stodgell v. Mounter, Mo., 344 S.W.2d 100; Smith v. Siercks, Mo., 277 S.W.2d 521. And the jury could believe all or none of the testimony of the operator, or believe it in part and reject it in part. Lay v. McGrane, Mo., 331 S.W.2d 592, 597. Plaintiff was also entitled to the favorable evidence of herself and her witness Menzel that, when entering the third lane, they looked, could see 75–90 feet, and that the bus was not there. This extends considerably the permissible distance for the slackening of speed,—dependent, of course, on the jury's finding as to when imminent peril arose. A slowing of an additional one-half second or less (three feet of plaintiff's travel at five miles an hour) would have permitted plaintiff to escape. And, according to the operator, he *stopped* the bus within seven feet of the point of impact, in what (according to Woods) was a normal stop. We hold that there was a submissible jury question. See: DeLay v. Ward, 364 Mo.

431, 262 S.W.2d 628, 636; Stith v. St. Louis Public Service Co., 363 Mo. 442, 251 S.W.2d 693, 698, 34 A.L.R.2d 972; Pitcher v. Schoch, 345 Mo. 1184, 139 S.W.2d 463; Prince v. Bennett, Mo., 322 S.W.2d 886, loc. cit. 889, containing discussions of the "almost escaping" doctrine. We are aware of the criticism of that doctrine, Hunt v. Chicago, M. St. P. & P. R. Co., Banc, 359 Mo. 1089, 225 S.W.2d 738, 741, and do not rely upon it to the extent that "no evidence, either direct or circumstantial, is required." Hunt, supra. However, not always is "specific proof of the extent that the speed could be slackened" required. Prince, supra. There was evidence from which the jury might reasonably have inferred that the operator could and should have slowed the bus sufficiently, with the means at hand, after plaintiff entered the zone of imminent peril and after he saw or *should have seen* her, to have allowed her to move out of the path of the bus.

 Having determined that there was a submissible humanitarian case, we consider plaintiff's assignments here as to defendant's Instruction No. 6. Defendant asserts that some of the points now made are insufficient, and that some were not preserved in the motion for new trial. We deem those which we now consider sufficiently raised and preserved under a rather liberal construction. In its essential parts that instruction was as follows: "* * * that * * * the operator of the motorbus * * * was driving * * * in the lane of traffic next to the south curb lane of Natural Bridge, and if you further find that when the front end of said motorbus was approximately 35 feet west of the driveway mentioned in the evidence it was travelling at a speed of 20 to 22 miles per hour, and if you find that the operator of said motorbus observed plaintiff's automobile moving southwardly across the eastbound lanes of traffic toward said driveway at a speed of approximately 5 miles per hour when the front end of plaintiff's automobile was approximately in the center of the middle lane

for eastbound traffic on Natural Bridge Boulevard, and if you further find that the plaintiff continued driving her automobile southwardly and drove directly in front of and in close and dangerous proximity to defendant's motorbus at a time when it was too late for the operator of the motorbus in the time and space available and in the exercise of the highest degree of care, with the means and appliances at hand, to have brought said motorbus to a stop in time * * * and if you find that the operator of the motorbus was at all times exercising the highest degree of care in the operation of said motorbus and was not negligent under any of the other instructions submitted to you herein, then, in that event, plaintiff is not entitled to recover * * *."

Plaintiff insists that this is a sole cause instruction, while defendant says that it is a "no negligence" instruction, merely setting out affirmative facts on defendant's theory to show that it was not negligent. It makes little difference what we call it; it did attempt to hypothesize defendant's theory and directed a verdict. It must have been complete, both in the essentials of its hypothesization and in a recognition of defendant's duties. This instruction does not fix the location of the bus at the time the operator first saw plaintiff's car, it does not even mention a position of imminent peril as such, nor require a finding as to when plaintiff entered that position as a basis for a negation of defendant's humanitarian negligence; it completely ignores the possibility (and perhaps probability) that the operator should have seen plaintiff's car before he actually did; in other words, it speaks as from the time when the operator *saw* plaintiff and not as of the time when he saw or reasonably *should* have seen her. In addition, and of much importance, it relieves defendant of all liability if the operator was unable to avoid the collision by stopping, completely ignoring the submitted duty of *slackening* sufficiently to avoid the collision; in this later respect if defendant intends to say, as

apparently it does, that slackening was included in the cover-all phrase "and was not negligent under any of the other instructions," most certainly the submission of stopping and *not* of slackening was misleading, and the general reference to other instructions and to the exercise, generally, of the highest degree of care was not sufficient either to correct that false impression (Ozbun v. Vance, Mo., 323 S.W.2d 771, 774, 775; Bootee v. Kansas City Public Service Co., 353 Mo. 716, 183 S.W.2d 892, 897) or the failure to hypothesize facts to sustain a finding of no humanitarian negligence. While the instruction does not specifically use the word "negligence" as applied to plaintiff's acts, it might well be construed as permitting a consideration of her antecedent negligence. Except for the generalizations regarding "other instructions" and the degree of care exercised, the instruction ignores the operator's duty to keep a careful lookout, the primary negligence submission. In Ozbun v. Vance, Mo., 323 S.W.2d 771, the court said at loc. cit. 775: " * * * we add that, having directed the jury's attention to a specific set of facts hypothesized as absolving defendant from responsibility for humanitarian negligence but omitting from the hypotheses the further essential facts which if found to be true would negate antecedent primary negligence as submitted in behalf of a plaintiff, it would seem that a defendant could not supply the omitted essential facts by a general 'catch-all' phrase such as 'and if you further find that defendant was not guilty of any negligence as submitted to you in other instructions,' which clause at best, in a verdict-directing instruction such as defendant's Instruction No. 1-D given in this case, is confusing and misleading. See Rohde v. St. Louis Public Service Co., Mo.Sup., 249 S.W.2d 417, at page 421." When we also consider the probable conflict with physical facts involved in this submission, the errors noted become particularly insidious. On the elements required in such an instruction generally, see: Janssens v. Thompson, Banc,

360 Mo. 351, 228 S.W.2d 743; Payne v. Smith, Mo., 322 S.W.2d 764 (in failing to converse the humanitarian submission); Landau v. St. Louis Public Service Co., Mo., 322 S.W.2d 132; Klecka v. Gropp, Mo., 278 S.W.2d 790. We hold that the giving of Instruction No. 6 was prejudicial error.

■ In view of another trial we must consider the contention that plaintiff was contributorily negligent as a matter of law, thus barring a primary negligence submission. We hold that she was not, although a jury might well find her to have been. Again giving her the benefit of the most favorable evidence, we find: that there was evidence that plaintiff looked as she entered the third lane, could see for 75–90 feet and that there was no bus there; that this was confirmed by Miss Menzel; that a bus at 20–22 miles an hour could stop in 72 feet; that she needed to travel only ten feet plus the length of her car to clear the third lane; that one conceivably might not expect a bus to be running in the curb lane, reserved for parking and bus stop zones; that in the 17 feet plus which she traveled to the curb it was necessary for her to watch for pedestrians on the sidewalk, and she could not continually turn her head; that there was no specific prohibition against making this sort of turn; that the bus was running so close to the curb that, at impact, one could have stepped from it to the curb, and that this fact may have made it more difficult to see; and that the physical facts mitigate strongly against the operator's testimony that plaintiff drove out in front of the bus when it was less than 35 feet away. Defendant argues that where there is a duty to look, a failure to see what is plainly visible is negligence as a matter of law. Douglas v. Whitledge, Mo.App., 302 S.W.2d 294. The rule as often stated is that one charged with looking, is held to have seen what looking would reveal (Lilly v. Boswell, 362 Mo. 444, 242 S.W.2d 73; Witt v. Peterson, Mo., 310 S.W.2d 857), which may be substantially the same thing. We

cannot say under this evidence at what point the bus would have been "plainly visible" to plaintiff, nor just when she should have seen it. Generally, as indicating a jury question here, we may note: Cooksey v. Ace Cab Co., Mo., 289 S.W.2d 40; Pender v. Foeste, Mo., 329 S.W.2d 656; Slaughter v. Myers, Mo., 335 S.W.2d 50; Steele v. Goosen, Mo., 329 S.W.2d 703; Montgomery v. Petrus, Mo.App., 307 S.W.2d 24; Moore v. Southwestern Bell Telephone Co., Mo., 301 S.W.2d 817; Hoppe, Inc. v. St. Louis Public Service Co., Mo.App., 227 S.W.2d 499; Jones v. Fritz, Mo.App., 353 S.W.2d 393. The facts in every case differ so widely that no one is ordinarily a controlling authority in another. What we have said is applicable to negligence charged under § 304.021(6) as well as to common law negligence. Plaintiff was entitled to a submission on the primary negligence issue of lookout.

■ Plaintiff complains here of Instruction No. 2 submitting the defense of contributory negligence. Since the case is to be retried, the parties may reconsider the instruction in the light of the objections. We shall mention very briefly two other points raised here. On redirect examination of the operator of the bus, plaintiff brought out the fact that he had obtained the names and addresses of 14 persons at the scene of the collision, largely passengers. It was further developed that he had made a report, but that he had not brought the report or any witness cards with him, except those of plaintiff and Elizabeth Menzel. The court thereafter permitted defendant's counsel to read from its own answers to interrogatories enough to show that the names and addresses obtained by the operator were furnished to plaintiff. The point made here is that this evidence was self-serving and incompetent. It merely served to explain away the inference that plaintiff did not have the names and that perhaps they were being withheld; certainly there was no abuse of the court's discretion in admitting the evidence.

■ The witness Elizabeth Menzel had filed suit for her injuries against plaintiff and the Public Service Company jointly. Defendant brought out in her cross-examination that she had made a claim against plaintiff and had settled it; on redirect, plaintiff's counsel showed that she had also made claim against the Public Service Company and had settled that. Thereafter, out of the presence of the jury counsel for defendant obtained permission to ask this witness, and did ask her, the following question: " * * * out of the total settlement * * * three-fourths was paid by Mrs. Carlson, isn't that true?" The answer was that the witness did not know "who paid what." We deem the question improper and the objections to it, made largely out of the presence of the jury, sufficient. In view of our reversal on other grounds, it is unnecessary to determine whether the asking of that question, in itself, constituted prejudicial error.

The judgment is reversed and the cause remanded for a new trial.

All of the Judges concur.